(607 P.2d 530)

No. 50,945

STATE OF KANSAS, *Appellee,* v. JEFFREY L. GREENBERG, *Appellant.*

Petition for review denied June 20, 1980.

Opinion filed February 29, 1980.

*Stephen W. Brown* and *John C. Peck,* of Legal Aid Society, Inc., of Lawrence, for the appellant.

*Harry E. Warren,* assistant district attorney, *Robert T. Stephan,* attorney general, *Michael J. Malone,* district attorney, and *Bernard Brown,* legal intern, for the appellee.

Before FOTH, C.J., ABBOTT and REES, JJ.

FOTH, C.J.: Jeffrey L. Greenberg was convicted in a trial to the court of operating an uninsured motor vehicle in violation of K.S.A. 1979 Supp. 40-3104, and was fined $100. He appeals, contending primarily that the use at trial of his admission to the investigating officer that he was uninsured violated his rights under the Fifth Amendment. Secondary contentions go to the alleged prejudice of the trial judge and to the sentence imposed.

Defendant was involved in a two car accident on December 13, 1978. Both drivers were injured, and both remained at the scene until the arrival of Officer Barbara Sult of the Lawrence Police Department. She sent them independently to local hospitals for treatment, and pursued her accident investigation there. She described her interview with defendant in the following terms:

"At which time I was investigating the accident, I did ask Mr. Greenberg his name, address, and for his driver's license. He produced a New York driver's license. And I asked him whether he had the name of his insurance company and the policy number. At that time, he advised me that he did not have insurance."

It is this testimony on which defendant bases his Fifth Amendment claim, employing two theories.

## I.

He first argues inadmissibility because no *Miranda*[1] warning was given him before Officer Sult questioned him. This objection was raised at trial and summarily overruled.

Although the issue is not as clear cut as the trial court apparently regarded it, we think the proper result was reached. "A defendant's statements to a police officer are not automatically inadmissible for failure to give him the *Miranda* warning unless the statements are the product of custodial interrogation." *State v. Edwards,* 224 Kan. 266, Syl. § 1, 579 P.2d 1209 (1978); *State v. Bohanan,* 220 Kan. 121, Syl. § 1, 551 P.2d 828 (1976). In *Bohanan* the Court contrasted a "custodial interrogation" where the warning is required with an "investigatory interrogation" where it is

---

[1] *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966).

not. The latter variety was defined as "the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way." *State v. Bohanan,* 220 Kan. at 128. Custodial interrogation on the other hand, requires "significant restraints on [a subject's] freedom of movement which are imposed by some law enforcement agency." *State v. Brunner,* 211 Kan. 596, Syl. § 2, 507 P.2d 233 (1973).

The underlying purpose of *Miranda* is to protect a suspect from the coercive pressures generated by the simple fact of being in police custody. That custody usually takes the form of arrest, and *Miranda* itself dealt with the coercive atmosphere of the police station. The doctrine has been extended to other situations, but in those cases where it took place elsewhere "custody" has been manifested by a demonstrated intent and capacity of the interrogator to physically prevent the subject from avoiding the interrogation. *E.g., Mathis v. United States,* 391 U.S. 1, 20 L.Ed.2d 381, 88 S.Ct. 1503 (1968) (defendant in state prison); *Orozco v. Texas,* 394 U.S. 324, 22 L.Ed.2d 311, 89 S.Ct. 1095 (1969) (four police officers entered defendant's boarding house bedroom at 4:00 a.m.).

Here the defendant had not been arrested or otherwise taken into custody by Officer Sult; she had merely suggested that he needed medical attention, and he proceeded to the hospital with the assistance of friends. His situation was strongly analogous to that of the hospitalized defendant in *Brunner,* where "custody" was found lacking.

Recognizing this, defendant argues that he was in "constructive" custody by virtue of our "hit-and-run" statute, K.S.A. 8-1602, making it a misdemeanor for a motorist involved in an injury accident to leave the scene without complying with what is now K.S.A. 1979 Supp. 8-1604. The latter statute (quoted in the next section) requires the motorist to give identification and, under some circumstances, other information including insurance data, to the other parties to the accident and to any investigating officer.

The hit-and-run statute does not, in our view, create the kind of "custody" which invokes the absolute duty to give the *Miranda* warnings. It is not the presence of the police officer which

inhibits the subject's movement, but the possibility of criminal liability if he leaves the scene. Indeed, 8-1604 contemplates that no officer may ever be present at the scene. In that event, after giving information to the other parties, the motorist is to file a written report. While there is a certain element of coercion in the overall reporting scheme—to be dealt with below—there is no "custodial" interrogation but only "investigatory" interrogation at the scene or, as here, at the hospital afterward. The result is that defendant's admissions were not fatally tainted by the lack of *Miranda* warnings.

## II.

Defendant's second Fifth Amendment theory is that his incriminating response to the officer's question was coerced by the terms of the reporting statute, K.S.A. 1979 Supp. 8-1604(*a*):

"(*a*) The driver of any vehicle involved in an accident resulting in injury to or death of any person, or damage to any vehicle or other property which is driven or attended by any person, shall give his or her name, address and the registration number of the vehicle he or she is driving, and upon request and *if available* shall exhibit his or her license or permit to drive, the name of the company with which there is in effect a policy of motor vehicle liability insurance covering the vehicle involved in the accident and the policy number of such policy to any person injured in such accident or to the driver or occupant of or person attending any vehicle or other property damaged in such accident, and shall give such information and upon request exhibit such license or permit and, *if available,* the name of the insurer and policy number, to any police officer at the scene of the accident or who is investigating the accident . . . ." Emphasis added.

The statute thus requires a motorist involved in an accident to furnish to other parties involved, and to any investigating officer, three kinds of information. First, there is an unqualified duty to furnish the driver's name and address both to other parties and to an investigating officer. Second, the driver's permit to drive is to be exhibited to other parties "if available," and must be exhibited to an officer on demand. Third, insurance information is to be furnished "if available" either to parties or an officer.

A Fifth Amendment challenge to a hit-and-run statute requiring name and address was rejected in *California v. Byers,* 402 U.S. 424, 29 L.Ed.2d 9, 91 S.Ct. 1535 (1971). Although there was no majority opinion in that case, in two separate opinions a majority of the justices relied on a balancing of the public necessity for enforcement of its regulations against the hazards of self-incrimination inherent in any compulsory reporting system. The balance in that case was struck in favor of the serious need to

control traffic on the highways, which was found to outweigh the minimal risk of self-incrimination.

Our examination of cases where a compulsory self-reporting scheme has been measured against a Fifth Amendment self-incrimination claim reveals that they fall into two groups. In the first, the reporting requirement is part of a scheme aimed primarily at enforcing the criminal law. Undesirable conduct is first made criminal, and then those who engage in it are required to report the fact under threat of further criminal sanction for failure to report. Such schemes are invariably stricken down on Fifth Amendment grounds. See *e.g., Albertson v. SACB.,* 382 U.S. 70, 15 L.Ed.2d 165, 86 S.Ct. 194 (1965) (federal statute requiring registration of Communist Party membership); *Marchetti v. United States,* 390 U.S. 39, 19 L.Ed.2d 889, 88 S.Ct. 697 (1968) (federal wagering tax statutes requiring registration before engaging in the business of accepting wagers and payment of annual occupational tax); *Grosso v. United States,* 390 U.S. 62, 19 L.Ed.2d 906, 88 S.Ct. 709 (1968) (federal statute imposing excise tax on proceeds from wagering); *Haynes v. United States,* 390 U.S. 85, 19 L.Ed.2d 923, 88 S.Ct. 722 (1968) (federal statute requiring registration of certain firearms); *Leary v. United States,* 395 U.S. 6, 23 L.Ed.2d 57, 89 S.Ct. 1532 (1969) (federal statute imposing tax on transfers of marihuana).

The second group comprises cases where the primary aim of the legislation is regulatory, and the reporting requirement seeks primarily to enforce the regulation. Again sanctions may be imposed for noncompliance, either with the regulation or the reporting requirement, but the purpose of the act is to insure compliance and not to catch criminals. The incidental possibility of self-incrimination in such cases is not enough to excuse the making of the report. Into this category fall *Byers; Shapiro v. United States,* 335 U.S. 1, 92 L.Ed. 1787, 68 S.Ct 1375 (1948) (defendant's records used to convict him of Price Control Act violations); and *United States v. Sullivan,* 274 U.S. 259, 71 L.Ed. 1037, 47 S.Ct. 607 (1927) (federal income tax return could be compelled even though it might reveal violations of the National Prohibition Act). In the last case the Court observed, through Justice Holmes, that it would "be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime." 274 U.S. at 263-4.

Although the effective majority in *Byers* did not agree on all the factors to be considered in formulating an appropriate balancing test, they did agree that the risk of self-incrimination was on one side, and the government's need on the other. They also agreed that such a test should be employed. It was appropriate there, and in our opinion is appropriate here, because the primary objective of the pertinent self-reporting scheme is not the enforcement of criminal laws. An extension of the privilege to traffic regulatory schemes would significantly interfere with societal goals unrelated to the deterrence of behavior through criminal sanctions. As Justice Harlan points out:

"Technological progress creates an ever-expanding need for governmental information about individuals. If the individual's ability in any particular case to perceive a genuine risk of self-incrimination is to be a sufficient condition for imposition of use restrictions on the government in all self-reporting contexts, then the privilege threatens the capacity of the government to respond to societal needs with a realistic mixture of criminal sanctions and other regulatory devices." 402 U.S. at 452.

Typical of the government's response to modern societal needs is its universal regulation of who may employ our highways. As noted, the second response dealt with in our reporting statute is the production of a driver's license, on an "if available" basis to other parties to the accident, compulsorily when requested by an officer. The latter requirement is consistent with K.S.A. 8-244, requiring every driver to carry a license and display it on the demand of a peace officer.

The validity of the driver's license requirement has never been seriously challenged so far as we know. In *State v. Frizzell*, 207 Kan. 393, 485 P.2d 160 (1971), a "driver's license check lane" was found to be authorized by the statute, and the officer's observations made while conducting the license check gave probable cause for a search of the car.

The *Frizzell* doctrine was extended to a random stop of a single car in *City of Overland Park v. Sandy*, 225 Kan. 102, 587 P.2d 883 (1978). The latter case, insofar as it authorized random stops, was effectively overruled by *Delaware v. Prouse*, 440 U.S. 648, 59 L.Ed.2d 660, 99 S.Ct. 1391 (1979). The basis of *Prouse*, however, was the Fourth Amendment right to be free from unreasonable searches and seizures. In that case the random spot check was distinguished from the roadblock as being a more serious inva-

sion of the individual's Fourth Amendment interests. In analyzing the relative utility of spot checks as against other means of enforcing license requirements the court observed:

"The foremost method of enforcing traffic and vehicle safety regulations, it must be recalled, is acting upon observed violations. Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be ascertained. . . . Furthermore, and again absent something more than mere assertion to the contrary, we find it difficult to believe that the unlicensed driver would not be deterred by the possibility of being involved in a traffic violation or having *some other experience calling for proof of his entitlement to drive* but that he would be deterred by the possibility that he would be one of those chosen for a spot check." 440 U.S. at 659-60. Emphasis added.

Finally, the *Prouse* court specifically recognized the State's right to check drivers' documentation by methods that do not involve the unconstrained exercise of discretion, including "[q]uestioning of all oncoming traffic at roadblock-type stops." 440 U.S. at 663.

It will be observed that there is no hint in the court's language that demanding documentation of a motorist's right to drive in any way infringes upon his Fifth Amendment rights. Indeed, the case proceeds on the premise that if the stop meets Fourth Amendment standards of reasonableness, violators who are so discovered may be prosecuted as a result of the discovery. Stops which the Court indicates meet Fourth Amendment standards include roadblocks, stops for traffic violations, and "other experiences" calling for documentation. Collisions, we suppose, are prime examples of such "other experiences."

In this case we are concerned with the third piece of information required by our statute, and that is insurance data to be furnished to other parties to the collision and to the investigating officer, in both cases "if available." We are unable to distinguish the potential for self-incrimination in this requirement from that inherent in the driver's license requirement—if anything, the risk is less, and the State's need is greater.

Our statute, while presenting a realistic hazard, does not *require* an incriminating answer. This feature serves to distinguish it from that part of the Connecticut "no-fault" statute considered in *Gentile v. Altermatt,* 169 Conn. 267, 304-7, 363 A.2d 1 (1975). That statute, as implemented by regulation, required a motorist involved in an accident to file a report with a separate signed

section either giving insurance information or stating that there was none. Failure to complete the report subjected the motorist to license suspension and a fine. The Connecticut court found the reporting requirement constitutionally sound, but opined that the report of an uninsured motorist could not be used in a prosecution for driving without insurance because it was, in essence, a compelled signed confession. If, under our statute the question was, "Do you have insurance?" we might find the Connecticut reasoning more persuasive, although perhaps still not as compelling as the driver's license analogy.

Both the driver's license and the insurance requirement serve important public ends: the one safety on the highway, the other financial responsibility for property loss and personal injury which might in extreme cases lead the victims to becoming public charges. Applying a balancing test as suggested by *Byers* leads us to the same result in both instances. There is a strong governmental interest in keeping unsafe and unqualified motorists off the highways, and the reporting requirement is reasonably designed to serve that end. The requirement is aimed at regulatory ends and not at criminal law enforcement. If an officer may constitutionally demand a motorist's driver's license, we see no reason why he may not inquire as to the motorist's insurance policy, "if available." We conclude that defendant's admission was not impermissibly coerced by our statute and that it was properly admitted into evidence against him.

### III.

Defendant also alleges that the trial judge demonstrated bias and prejudice against him, denying him a fair trial. The allegation is based on the judge's expressed opinion at the outset that unless defendant had a defense to the charge by way of a valid insurance policy, a trial would be a waste of time for all involved. The remarks were, to say the least, unfortunate and ill advised. However, the judge also explicitly recognized defendant's right to put the State to its proof. Except for a rather brusque treatment of the defense objection, he conducted the very short trial required in a manner we find unexceptionable. There was only one contested issue, and that was the admissibility of defendant's statement to Officer Sult discussed above; there was no defense testimony and no closing argument on either side. Although we can't condone the trial judge's remarks, they did recognize the reality of the situation, and we find they did not result in an unfair trial.

## IV.

Finally, defendant complains that the $100 fine imposed represented a penalty for exercising his constitutional right to a trial. In this he is patently correct. The trial court's concluding words were:

"The defendant will be found guilty. Based upon the fact that this is, in the Court's opinion, just a waste of time, the Court is going to assess a fine that will be set in the amount of one hundred dollars—the normal fine is fifty dollars—together with the costs."

Penal sanctions imposed vindictively, as official retaliation for an accused's exercise of constitutional rights, cannot be sustained. *North Carolina v. Pearce,* 395 U.S. 711, 723-4, 23 L.Ed.2d 656, 89 S.Ct. 2072 (1969). "[W]hether a defendant exercises his constitutional right to trial  .  .  .   must have no bearing on the sentence imposed." *Hess v. United States,* 496 F.2d 936, 938 (8th Cir. 1974), citing numerous cases.

In its brief the State urges that "[t]he attempted frustration of justice in such cases by appeal to technicality should hardly be approved of by the courts." We cannot characterize defendant's Fifth Amendment argument in this case as an "appeal to technicality," even though in the long run we reject the argument. Even if it were so, in our accusatorial and adversary system of criminal justice an accused is entitled to have the State prove his guilt by competent, admissible evidence. The "technicalities" involved in that process are the stuff of which our law is made.

The conviction is affirmed, but the sentence is vacated and the case remanded to the trial court for the imposition of a new sentence in accordance with the principles set forth above. Costs on appeal are assessed one-half to defendant and one-half to the State.