No. 71,817

STATE OF KANSAS, *Appellee*, v. BOB EWING, *Appellant*.

(904 P.2d 962)

Opinion filed October 27, 1995.

*Carl E. Cornwell*, of Cornwell & Edmonds, of Wichita, argued the cause and *Keith C. Sevedge*, of Kansas City, was with him on the brief for appellant.

*Jerome A. Gorman*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a direct criminal appeal from jury convictions of first-degree murder and aggravated battery. The defendant, Bob Ewing, raises a single issue involving the admission over his objection of his statement made at the scene in response to a question asked of him by the investigating officer without the benefit of a *Miranda* warning. We conclude the erroneous admission was harmless error and affirm.

Although the jury was presented with conflicting versions of how the crimes occurred, the facts necessary for the resolution of the single issue presented are not in dispute. A detailed statement of facts is necessary to demonstrate the harmless nature of the error raised.

Evelyn Wayne is the former wife of the defendant; the wife of Charles Wayne, the victim of the defendant's aggravated battery; the sister of the murder victim, Johnella Guinn; and the mother of the defendant's daughter, Misty Ewing. The defendant had been married to Evelyn Wayne for quite some time when they divorced in 1990. According to Evelyn, she and the defendant remained on good terms after the divorce until she started dating Charles. Evelyn testified that after her marriage to Charles the defendant became despondent and began threatening Charles.

The incident which led to the defendant's convictions occurred on February 7, 1993. Evelyn and Charles had attended church with members of Evelyn's family and then went to Evelyn's parents' house, which was next door to the defendant's house. When they arrived, the defendant was in his driveway washing his truck. They did not speak to or acknowledge the defendant.

Evelyn and Charles ate dinner at her parents' house. That afternoon, the defendant called the house and asked Evelyn if he could pick up some cleaning supplies of his which were at her

house. Evelyn told him he could do so if he brought the police along. The defendant also asked Evelyn to send Charles outside because the defendant wished to apologize to him for things that he had said previously. Evelyn told him an apology was not necessary.

Later that afternoon, Evelyn and Charles prepared to leave. Charles testified that he opened the car door for his wife, walked around the car, and got in the driver's seat. At this point, the defendant was standing in his yard. As Charles was preparing to shut the door he heard Misty Ewing shout: "Daddy, don't. Daddy, don't." Charles testified that he bent over to get his gun out from under the seat of the car because he was fearful of what the defendant might do to him. As he was trying to get the weapon, he saw the defendant standing outside the car with a gun. The defendant fired two shots, one of which went through both of Charles's legs.

Evelyn saw the defendant approach the car with a gun in his hands. She testified that she heard her daughter, Misty, saying, "Daddy, don't," and then heard two shots. As Evelyn got out of the car, she saw her sister, Johnella Guinn, running up towards the defendant. She testified that the defendant turned around, pointed the gun at Guinn, and fired. Guinn was struck by one bullet and died as a result of the wound.

The defendant testified that as Charles and Evelyn entered the car, he approached the car with some bills he needed to give to Evelyn. He stated that he saw Charles reach down beneath the seat and pull out a gun. He then pulled out the gun that he kept with him and shot Charles in self-defense. His daughter, Misty, then tried to get the gun away from him. During their struggle the gun accidentally discharged, killing Guinn.

Gary Granger, a Kansas City police officer, was patrolling approximately one block away from the incident when he was called to the address by the dispatcher. He arrived on the scene to find a crowd of approximately 30 people milling around. He checked Guinn for a pulse but found none.

From people in the crowd, Officer Granger discovered that a person named Ewing shot Guinn and that Ewing was next door.

Granger did not know anyone named Ewing. Granger went to Ewing's house and as he approached, two males, one of whom was Ewing, walked out of the house. Officer Granger drew his gun and told both of the males to halt and put their hands where he could see them. He then asked: "Who shot the lady?" The taller of the two pointed to Ewing. Ewing stated: "I shot the bitch." According to Granger's direct testimony at trial, Ewing was then taken into custody. However, in a hearing prior to trial, upon cross-examination, Granger had stated that he placed the defendant in custody when he emerged from the house. Granger then began searching for Ewing's weapon, which he found on the front porch of Ewing's house.

Prior to trial, the defendant moved in limine to suppress the statement he made to Granger on the ground that he had not been advised of his *Miranda* rights. The court denied the defendant's motion on the basis that the two individuals were not in custody at the time the defendant made his statement and on the further basis that the investigation had not focused on the defendant. At trial, the defendant again objected to the admission of his statement.

The first question we must resolve is whether the district court erred by admitting the defendant's statement to Granger. The defendant argues that he was in custody and undergoing interrogation and, therefore, his rights were required to be given to him, based on the ruling of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

*Miranda* holds that the State may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the privilege of self-incrimination. 384 U.S. at 444. It is undisputed that these procedural safeguards were not used prior to the defendant's statement to Granger, "I shot the bitch." Therefore, the proper question is whether the statement stemmed from a custodial interrogation of the defendant.

The district court refused to suppress based on two reasons: (1) The defendant was not in custody at the time the statement was made, and (2) the officer had not focused his suspicion on the

defendant. In a recent case, *Stansbury v. California*, 511 U.S. ___, 128 L. Ed. 2d 293, 114 S. Ct. 1526 (1994), the United States Supreme Court held that whether the interrogating officers had focused their suspicions upon the individual being questioned is not relevant for purposes of *Miranda* if those suspicions are not disclosed to the defendant. 128 L. Ed. 2d at 301. The Court held that an officer's knowledge or beliefs may bear upon the custody issue if they are being conveyed by word or deed to the individual being questioned, but they are relevant only to the extent they would affect how a reasonable person would gauge his or her freedom of action. 128 L. Ed. 2d at 300. Therefore, the determining factor in deciding whether a *Miranda* warning is required is whether the person has been taken into custody. See 128 L. Ed. 2d at 298-99.

In this case, Granger testified at trial that he put the individuals in custody after Ewing made his statement. However, as *Stansbury* makes clear, the subjective belief of the officer is not an issue in determining whether a suspect is in custody for the purposes of *Miranda* unless it is actually communicated to the suspect. See *Stansbury*, 128 L. Ed. 2d at 300.

An officer's obligation to administer a *Miranda* warning attaches only where there has been such a restriction on the suspect's freedom as to render him or her in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977); see *State v. Fritschen*, 247 Kan. 592, Syl. ¶ 2, 802 P.2d 558 (1990). In determining whether an individual was in custody, the "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. [Citation omitted.]" *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983); see *Stansbury v. California*, 128 L. Ed. 2d at 298 (quoting this standard); see also *State v. Fritschen*, 247 Kan. at 599 (discussing this standard).

The initial determination of custody depends upon the objective circumstances of the interrogation, and the only relevant inquiry is "how a reasonable man in the suspect's shoes would have understood his situation." *Stansbury v. California*, 128 L. Ed. 2d at 299 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 422, 82 L. Ed. 2d 317, 104 S. Ct. 3138 [1984]. Kansas has not deemed it prudent to

set forth any hard and fast factors in making this determination, instead preferring to determine each case on its facts. See *State v. Fritschen*, 247 Kan. at 603.

We conclude that the defendant was in custody when Granger asked his question. Granger had ordered the defendant to stop at gunpoint. He then asked a question which by its nature would elicit a confession. At this time, a reasonable person would have believed that his freedom of action was significantly curtailed. The conduct by Granger was also the type of conduct which is associated more with a formal arrest than an informal request for information. Granger himself stated at the motion in limine hearing that he placed the defendant in custody before asking his question. Under the circumstances, the defendant was in custody and should have been advised of his *Miranda* rights prior to interrogation. This conclusion, however, does not end our inquiry. Even an error of constitutional magnitude may be harmless. If this court possesses a firm belief beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial, it may be declared harmless. *State v. Watson*, 256 Kan. 396, Syl. ¶ 7, 885 P.2d 1226 (1994).

The defendant's response to the officer's question identified the defendant as the one who had shot Guinn. However, identity was not in issue in this case. All testifying witnesses, including the defendant, readily admitted that it was the defendant who shot Guinn. The defendant's theory was that he shot Guinn accidently. Thus, the response identifying the defendant as the shooter did not prejudice the defendant in light of his own admission and the overwhelming evidence establishing the defendant as the shooter.

The defendant argues that his response with the inclusion of the word "bitch" caused substantial prejudice, requiring that we reverse and remand for a new trial. We disagree. It must be noted that defendant's main objection is to his own choice of language and not to the question asked by Granger. Moreover, the defendant was able to fully develop his theory of the case, which was that his shooting of Guinn was accidental, resulting from a struggle with his daughter at the scene. His choice of the word "bitch" while identifying himself as the shooter did not prevent the jury from

considering evidence of an accidental shooting, especially in light of the fact that there was no evidence of animosity towards Guinn on the part of the defendant.

We conclude that under the circumstances of this case, beyond a reasonable doubt, the question by the investigating officer and the response of the defendant had little, if any, likelihood of changing the result of the trial. Thus, we conclude that the error is harmless and affirm the defendant's convictions.

The State makes a persuasive argument that a *Miranda* warning was not required in this case because of the public safety exception found in *New York v. Quarles,* 467 U. S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984), as applied by this court in the case of *State v. McKessor,* 246 Kan. 1, 6-7, 785 P.2d 1332 (1990). We need not discuss this exception based upon our firm conviction that any error in admitting the defendant's statement was harmless.

Affirmed.

LOCKETT, J., concurring: I concur in the majority's decision affirming the defendant's conviction but disagree with the majority's conclusion that the defendant was in custody and being interrogated in a manner that required the giving of the *Miranda* warning set out in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). In its analysis, the majority fails to recognize that there are two types of interrogation that may be conducted by a law enforcement officer, a "custodial interrogation" and an "investigatory interrogation."

In *Miranda,* the United States Supreme Court in its landmark decision discussing "custodial interrogation" proclaimed:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

*Miranda,* however, does not stand for an absolute proposition that law enforcement officers may never ask a detained citizen a question without first informing that person of the constitutional

right to remain silent. As the *Miranda* court observed, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." 384 U.S. at 477-78.

*Miranda* was decided in 1966. Shortly thereafter, in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the United States Supreme Court modified the bright line rule set by *Miranda*. The *Terry* court recognized that because of the government's general interest in preventing and investigating crime, under certain circumstances law enforcement officers have a right to physically stop and search individuals for personal safety purposes during an investigatory interrogation.

Based on *Terry*, the Kansas Legislature enacted K.S.A. 22-2402 in 1970. The statute, now K.S.A. 1994 Supp. 22-2402, provides that without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed, or is about to commit a crime and may demand the name and address of such suspect and an explanation of such suspect's actions. The statute further notes that after a law enforcement officer has stopped a person for questioning and reasonably suspects that the officer's personal safety requires it, the officer may frisk the person for firearms or other dangerous weapons. If the law enforcement officer finds a firearm or weapon, or other thing of which possession may be a crime or evidence of a crime, the officer may take and keep it until the completion of the questioning, at which time the officer shall either return the item if lawfully possessed or arrest the person. K.S.A. 1994 Supp. 22-2402(2).

In the absence of legislation of this kind, it could have been argued that a Kansas police officer had no power to search a suspect for weapons until an arrest has actually been made. The statute clarifies the power of the investigating officer to restrain an individual and make a preliminary search for weapons prior to an actual arrest. The justification and limitations applicable to such

statutory powers are expressed by the Supreme Court in *Terry v. Ohio,* 392 U.S. at 24-25.

The admissibility of the defendant's statements depends upon whether they were the result of a "custodial interrogation" or an "investigatory interrogation." A custodial interrogation, which requires that *Miranda* warnings be given, involves significant restraints on a subject's freedom of movement imposed by a law enforcement officer. See *State v. Brunner,* 211 Kan. 596, Syl. ¶ 2, 507 P.2d 233 (1973); *State v. Greenberg,* 4 Kan. App. 2d 403, 405, 607 P.2d 530, *rev. denied* 228 Kan. 807 (1980).

In *State v. Taylor,* 231 Kan. 171, 642 P.2d 989 (1982), this court faced a similar factual situation. Officers were aware that Taylor had shot and killed a store clerk. When Taylor was stopped for questioning, the officer asked him for his name. Taylor answered, giving a fictitious name. The officer knew the individual was Taylor and proceeded to frisk him. Taylor was then taken to the police station and again asked his name. He replied, "Harry Taylor, why should I lie anymore." Taylor was then advised of his constitutional rights pursuant to *Miranda,* which he voluntarily waived. 231 Kan. at 172.

On appeal Taylor argued that the statements he made before waiving his rights were inadmissible. The court observed that the admissibility of Taylor's statements depends upon whether they were the result of a "custodial interrogation" or an "investigatory interrogation." The *Taylor* court recognized that general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process does not constitute custodial interrogation requiring a *Miranda* warning. An investigatory interrogation, requiring no warning, is defined as the questioning of persons by law enforcement officers in a routine manner during an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way. 231 Kan. at 173.

The *Taylor* court noted that the term "interrogation" under *Miranda* refers not only to express questioning of a suspect, but also to any words or actions on the part of the police (other than those

normally attendant to arrest and custody) which the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. The *Taylor* court held that a request for a person to identify himself is not interrogation within the meaning of *Miranda* and found that the trial court did not err in admitting Taylor's answer. 231 Kan. at 174.

*State v. Roadenbaugh*, 234 Kan. 474, 673 P.2d 1166 (1983), was concerned with the governmental interest in investigating crime and the immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could be unexpectedly and fatally used against him. In reaching this conclusion the court noted that it was unreasonable to require police officers to take unnecessary risks in the performance of an investigatory interrogation. The *Roadenbaugh* court noted that the officer had a clear right, for personal safety purposes, to physically search the defendant for weapons. In so doing it is permissible to "spread-eagle" a suspect for the pat down or frisk and then feel the suspect's person for weapons. 234 Kan. at 477.

From people in the crowd at the scene of the shooting here, Officer Granger discovered that a person named Ewing shot Guinn and that Ewing was "next door." Granger did not know anyone named Ewing. Granger went to the house next door and as he approached, two males, one of which was Ewing, walked out of the house. Officer Granger drew his gun and told both of the males to halt and put their hands where he could see them. He then asked: "Who shot the lady?" Ewing answered the officer's question by stating: "I shot the bitch."

The officer was conducting an investigatory interrogation. After stopping Ewing and insuring that it was safe to investigate, the officers had the right to demand Ewing's name and address and ask who had shot the victim. The officer attempted to elicit a statement from the defendant but did not attempt to elicit a statement incriminating Ewing as to his intent. The Fifth Amendment to the United States Constitution does not prohibit all incriminating statements. Absent some officially coerced self-accusation, the Fifth Amendment privilege against self-incrimination is not violated by even the most damning admissions. *United States v. Washington*, 431 U.S. 181, 187, 52 L. Ed. 2d 238, 97 S. Ct. 1814 (1977). The United States Supreme Court reached a similar determination in *New York v. Quarles*, 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984). The trial court was correct in admitting Ewing's response to the officer's question.

McFARLAND, C.J., joins in the foregoing concurring opinion.