NOT DESIGNATED FOR PUBLICATION

No. 124,875

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AMBER NICOLE ALEXANDER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Submitted without oral argument. Opinion filed December 29, 2023. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., MALONE and ISHERWOOD, JJ.

PER CURIAM: Amber Nicole Alexander appeals the district court's judgment following her convictions of reckless second-degree murder, leaving the scene of an accident involving death, and interference with law enforcement by tampering with evidence. Alexander claims her convictions were not supported by sufficient evidence, the State committed prosecutorial error, the motor vehicle accident reporting statutes are unconstitutional as applied to her, and the Kansas Offender Registration Act (KORA), K.S.A. 2022 Supp. 22-4901 et seq., violates her rights under the First and Fourteenth Amendments to the United States Constitution. Finding no error, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

*An evening of drinking results in a deadly accident.*

Around 6 p.m. on August 6, 2021, Alexander joined her friends at a bar in Lansing before attending an outdoor music concert in Bonner Springs. According to Alexander, she drank only one beer while at the bar. One of her friends, Joseph Williams, recalled Alexander having two or three beers but did not remember whether she drank a shot with the group. Alexander rode with Williams to the concert, arriving around 8 p.m.

At the concert, Alexander claimed she had another beer and a canned margarita. Alexander posed for a photograph with a shot in her hand, but she explained she did not drink it because she does not like dark liquor. Another friend, Macy Woodruff, testified that she saw Alexander have a shot and a few beers while at the concert. Williams remembered seeing Alexander drink a shot, a margarita, and a beer.

After the concert, Alexander and her friends returned to the Lansing bar where they had begun their evening. Alexander stated she drank three more beers and two shots at the bar. Woodruff testified that she saw Alexander drink two or three shots and a couple of beers at the bar that evening. Williams testified he saw Alexander with another drink at the bar, but he left about an hour after arriving. The State provided surveillance footage from the bar that showed Alexander taking three shots that night.

Woodruff left the bar around 1:30 a.m. Before leaving, Woodruff claimed she offered to give Alexander a ride to Woodruff's house or to Alexander's parents' house nearby, but Alexander declined. Woodruff did not think Alexander appeared outwardly intoxicated, such as having slurred speech, glassy eyes, or balance issues, but her concern about Alexander driving that night stemmed solely from the number of alcoholic drinks she had consumed. Alexander denied ever having this conversation with Woodruff.

Around 2 a.m., Alexander left the bar and got into her vehicle to drive herself back to her home in Parkville, Missouri. Alexander exited the parking lot onto Fourth Street and began driving above the speed limit. Nearby, two teenagers, A.E. and M.L., were walking up Fourth Street on their way to a convenience store. M.L. was riding her bike but had gotten off and walked alongside it. They walked in the street about two feet from the curb because the sidewalk was dark and infested with cockroaches.

A.E. testified that she heard a vehicle drive by and looked up to see that the vehicle had struck M.L. A.E. saw the vehicle carry M.L. and her bike onto the passenger side of the hood for about 60 feet. The vehicle did not slow down and eventually swerved to the left, throwing M.L. and her bike off the hood and onto the street. The vehicle kept driving away. When A.E. reached M.L., she was unresponsive. A.E. called the police, who arrived 5 to 10 minutes later. M.L. was taken to the hospital where she later died from the injuries sustained in the accident. The pathologist who performed the autopsy testified that head trauma was the cause of M.L.'s death.

*Law enforcement investigation leads to Alexander.*

The law enforcement officers investigated the scene and found debris on the road, including pieces of a headlight and mirror cover. Officer Cera Baker testified that the police found M.L. about 67 feet from the start of the debris field. The officers also obtained video surveillance footage of a blue SUV striking M.L. Upon review of the surveillance video, several officers believed the SUV was speeding and swerving.

Law enforcement made a social media post seeking information about the accident and attached a picture of the suspected vehicle. Woodruff saw the post when she woke up the next morning. Realizing that the accident had occurred on the route Alexander normally takes to reach her house and that the vehicle in the picture looked like Alexander's vehicle, Woodruff asked Alexander whether it was her vehicle. Alexander

denied that it was her vehicle. She later claimed that it did not occur to her that she may have been the one in the accident because she assumed she would have known if she had hit someone. At some point, Woodruff contacted law enforcement to discuss her suspicions that Alexander may have been involved in the accident.

Alexander later testified that it was not until she took her dogs outside the next morning that she noticed her car was damaged. Thinking that someone else had clipped her car in the parking lot, Alexander filed an insurance claim. Alexander then went shopping with her mother for a few hours. When Alexander returned home, she began to feel ill, so she took medicine and laid down for a nap. She woke up feeling light-headed and dizzy, however, and decided that she needed to go to Urgent Care. Alexander testified that while driving herself to Urgent Care, she lost consciousness and awoke to find her vehicle stuck in a ditch on the side of the road. Alexander went to the emergency room where she was treated for dehydration and a severe sinus infection.

Edward Barber, the tow truck driver who removed Alexander's vehicle from the ditch, testified that he believed there was some damage to Alexander's hood that differed from the damage sustained from the surrounding vegetation in the ditch. Sergeant Matthew Nickel investigated the accident and also testified that the damage to Alexander's hood did not appear to be caused from driving into the ditch.

The next day, Leavenworth police called Alexander and informed her that she was a suspect in a fatal hit-and-run collision. Alexander agreed to speak with the police in person. She told the police that she did not recall seeing anyone walking in the middle of Fourth Street, and she did not recall hitting anyone with her vehicle.

The Leavenworth County Sheriff's Office obtained Alexander's vehicle from the tow company in Missouri with a search warrant. The officers determined the handlebars of M.L.'s bike matched the dent in Alexander's hood, and the white paint scratch on

Alexander's hood matched the paint color of the bike. The officers also discovered that the mirror cover and the headlight pieces found in the debris at the scene of the accident fit perfectly into the passenger side of Alexander's vehicle.

*Criminal proceedings in district court*

On August 10, 2021, the State charged Alexander with one count of reckless second-degree murder or in the alternative involuntary manslaughter committed while driving under the influence, one count of leaving the scene of an accident involving death, and one count of interference with law enforcement by tampering with evidence. The State's theory of the case was that Alexander struck M.L. and her bicycle and later staged her collision into the ditch to cover up the damage to her vehicle. The case proceeded to a three-day jury trial beginning on December 28, 2021.

Alexander testified that she realized her car was involved in the accident after seeing the debris from the scene matched the damage to her car. But when the accident happened, she thought she had merely hit a pothole and it did not occur to her until later that she may have been involved in the fatal accident. Alexander maintained that she had not seen anyone in the street that night, she felt comfortable driving after leaving the bar that morning, and she felt that she would have known if she was involved in an accident.

The jury convicted Alexander of reckless second-degree murder, leaving the scene of an accident involving death, and interference with law enforcement by tampering with evidence. On February 2, 2022, the district court sentenced Alexander to a controlling term of 117 months' imprisonment and ordered her to register as a violent offender for 15 years. Alexander timely appealed the district court's judgment.

Alexander first claims there was insufficient evidence to support any of her convictions based on her testimony that she at first was unaware that she was in an accident. The State asserts there was sufficient evidence to support each conviction. There is no requirement that a criminal defendant challenge the sufficiency of the evidence before the district court to preserve the issue for appeal. *State v. Hilyard*, 316 Kan. 326, 330, 515 P.3d 267 (2022).

When the sufficiency of the evidence is challenged in a criminal case, the appellate court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or weigh in on witness credibility. *State v. Buchanan*, 317 Kan. 443, 454, 531 P.3d 1198 (2023).

*Reckless second-degree murder*

For her second-degree murder conviction, Alexander argues there was insufficient evidence to show she acted recklessly because driving under the influence of alcohol is insufficient evidence to prove reckless conduct. She also points to her testimony that she at first did not know she was in an accident.

Under K.S.A. 2022 Supp. 21-5403(a)(2), reckless second-degree murder is the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." Kansas courts have held that evidence of driving while under the influence of alcohol does not equate to recklessness without additional evidence of reckless conduct. See *State v. Robinson*, 267 Kan. 734, 739, 987 P.2d 1052 (1999); *State v. Huser*, 265 Kan. 228, 236, 959 P.2d 908 (1998); *State v. Barajas*, 43 Kan. App. 2d 639, 647, 230 P.3d 784 (2010). But in some

6

cases the driver in a fatal automobile accident can be found guilty of reckless second-degree murder, and relevant factors to show a reckless state of mind include intoxication, speeding, near or nonfatal collisions shortly before the fatal accident, driving on the wrong side of the road, failure to aid the victim, failure to heed traffic signs, failure to heed warnings about reckless driving, and a prior record of driving offenses. *State v. Doub*, 32 Kan. App. 2d 1087, 1091-92, 95 P.3d 116 (2004).

Although Alexander's intoxication was likely the main contributing factor to the accident, it was not the only evidence the State used to show Alexander acted recklessly. Alexander tries to downplay her intoxication levels by noting that she had only seven drinks over several hours and witnesses testified that Alexander did not appear to be visibly drunk. But Woodruff and Willams testified that Alexander had at least 10 drinks that night. A rational fact-finder would determine that it would be dangerous for anyone to drive after having that many drinks. Additionally, when Woodruff offered to give Alexander a ride to her parents' house or to Woodruff's house, Alexander rejected her offer and disregarded the potential risk she posed by driving under the influence that night. Alexander then admitted that she was speeding when she left the bar.

The strongest evidence showing Alexander's indifference to the value of life is that she did not stop or slow down when she struck M.L., driving over 60 feet with M.L. and her bike on the hood of her vehicle before eventually swerving and throwing her off. Alexander kept driving away without stopping to assist M.L.

The most fundamental problem with Alexander's argument is that she asks this court to consider the evidence in the light most favorable to her when our standard of review requires the opposite. The jury rejected Alexander's testimony at trial, and we do not reweigh the evidence. Sufficient evidence exists for a rational fact-finder to determine beyond a reasonable doubt that Alexander acted recklessly under circumstances manifesting extreme indifference to the value of life.

7

*Leaving the scene of an accident involving death*

Alexander also claims there is insufficient evidence to show that she had the required mental state to support her conviction of leaving the scene of an accident involving death. Again, Alexander relies on her testimony that she at first did not know that she was in an accident involving M.L. and her bicycle.

K.S.A. 8-1602(a) requires a driver to remain at the scene of an accident involving injury or death until the driver provides the information required in K.S.A. 8-1604. To be in violation of this statute, Alexander needed to have a culpable mental state in that she "knowingly failed to stop." See *State v. Killingsworth*, No. 121,173, 2021 WL 762081, at *6 (Kan. App. 2021) (unpublished opinion). A person acts "knowingly" "when such person is aware of the nature of such person's conduct or that the circumstances exist" or "when such person is aware that such person's conduct is reasonably certain to cause the result." K.S.A. 2022 Supp. 21-5202(i). For the jury to find Alexander guilty of this crime, the State needed to prove that Alexander "knew or reasonably should have known that the accident resulted in injury or death." PIK Crim. 4th 66.111 (2021 Supp.).

Although Alexander claims she at first did not know she was in an accident, she admits that she felt some impact and thought she had hit a pothole. The video evidence shows Alexander's vehicle struck M.L. and carried her and her bicycle on the hood for 60 feet. Alexander then swerved to throw M.L. and her bicycle off the hood and continued driving without stopping. The impact was forceful enough to damage Alexander's headlight and mirror. We must consider the evidence in the light most favorable to the State. A rational fact-finder could conclude from the evidence that Alexander knew she was in an accident that resulted in injury or death. Thus, sufficient evidence exists to support Alexander's conviction for leaving the scene of an accident involving death.

*Interference with law enforcement by tampering with evidence*

Again, because Alexander claims she at first did not know that she was in an accident, she argues she could not have tried to cover up an accident she was unaware that she was in. To prove that Alexander committed interference with law enforcement, the State had to prove beyond a reasonable doubt that Alexander concealed, destroyed, or materially altered evidence with the intent to prevent or hinder her apprehension or prosecution. K.S.A. 2022 Supp. 21-5904(a)(2).

As stated above, there was sufficient evidence for a rational fact-finder to conclude Alexander knew she had hit M.L. Also, Alexander knew the police were looking for her vehicle. On the morning after the accident, Woodruff asked Alexander whether she was involved in an accident the previous night and attached the social media post from the police seeking information with a picture of Alexander's vehicle. Alexander also tried to make an insurance claim for her vehicle that morning after seeing the damage. Later that day, Alexander drove her vehicle into a ditch. According to Alexander, she fell unconscious on her way to seek medical treatment—but the jury was not required to believe that testimony. The tow truck driver and a police officer both shared the opinion that the car had prior damage before going into the ditch.

Again, we must review the evidence in the light most favorable to the State. By making an insurance claim and driving her vehicle into a ditch upon learning that the police were looking for her vehicle, a rational fact-finder could conclude that Alexander tried to conceal the damage to her vehicle to prevent suspicion that she was in an accident the previous night. Sufficient evidence exists to support Alexander's conviction for interference with law enforcement by tampering with evidence.

PROSECUTORIAL ERROR

Alexander next claims the State committed two instances of reversible prosecutorial error by misstating the law on jury nullification during voir dire and then misstating the State's burden of proof during its rebuttal closing argument. The State asserts that the prosecutor accurately stated the law in both instances.

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

When reviewing for prosecutorial error, the appellate court must consider prosecutorial statements in their context. *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020). Prosecutorial error claims are fact specific, and outcomes depend on the particulars of each case. *State v. Thomas*, 311 Kan. 905, 911, 468 P.3d 323 (2020). Misstating the law is outside the wide latitude given to prosecutors. *Becker*, 311 Kan. at 182. Error also occurs when prosecutors make arguments that dilute the State's burden of proof. *State v. Thomas*, 307 Kan. 733, 743, 415 P.3d 430 (2018). Our Supreme Court has

10

warned that prosecutors who try to define reasonable doubt through an analogy do so "at their peril." *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010).

*Comments in voir dire*

During voir dire, the prosecutor asked the potential jurors if they could judge the case based on the facts. The prosecutor then posed a hypothetical scenario involving a 75-year-old woman who received a ticket for speeding on her way to choir practice at church. The prosecutor asked the potential jurors whether they would find her guilty if all the evidence in the world was against the woman. Prospective Juror No. 31 stated that there should be some wiggle room. The prosecutor responded, "But if the judge instructs you on the law and he says if she was speeding and if it happened here, then you have to find her guilty, are you saying you wouldn't follow the law?"

Prospective Juror No. 31 agreed that he would follow the judge's instructions but did not believe that was the prosecutor's question. Other jurors agreed that they thought there should be wiggle room. The prosecutor then raised another scenario about a parent who murdered their child's drug dealer and reminded the jury, "Your role is to decide, based on the evidence, if the defendant is guilty or innocent, and you use the law the Court gives you to help you guide your decision. You will not have any say in any possible punishment." Potential Juror No. 4 stated the jurors' role was simply to determine guilt versus innocence. Potential Juror No. 13 agreed that the law should handle it. The prosecutor finished the discussion by stating,

> "So the law is the law. Like I said before, the judge will give you the law. You'll have it. Anyone here thinks they'll have trouble following the law, raise your number.
> "Your role is to decide, based on the evidence, if the defendant is guilty or innocent, and you use the law the Court gives you to help you guide your decision. You will not have any say in any possible punishment."

11

Alexander claims on appeal that this exchange eroded the concept of jury nullification and implied that the district court is the only source of mercy in a criminal proceeding. Alexander argues that it was error for the prosecutor to tell the potential jurors that they would "have" to find the woman guilty in the first hypothetical scenario.

In *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014), our Supreme Court held that an instruction from a district court that a jury "must" or "will" enter a guilty verdict flies "too close to the sun of directing a verdict for the State." A "judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164. Jurors have the "raw physical power to disregard both the rules of law and the evidence in order to a acquit a defendant," but the jury's proper function and duty is to accept the law as instructed by the district court, apply the law to the facts, and render a verdict based on the law applied to those facts. *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973). Kansas courts have long held that jurors are not to be instructed on jury nullification, and defendants do not have a "right" to jury nullification. *State v. Boothby*, 310 Kan. 619, 630-31, 448 P.3d 416 (2019).

In *State v. Pruitt*, 310 Kan. 952, 967, 453 P.3d 313 (2019), the court found no error when the prosecutor told the jury it must convict the defendant if it found that the State proved the charge beyond a reasonable doubt. The court reasoned that an instruction from the district court is fundamentally different from a prosecutor's closing argument, and the prosecutor used the word "must" to merely summarize how the State had proven the elements of the charge. 310 Kan. at 967. In *State v. Patterson*, 311 Kan. 59, 70, 455 P.3d 792 (2020), the prosecutor informed a prospective juror that the jury must follow the instructions they receive, and they cannot debate the law. The court held that the prosecutor's comments were not a misstatement of the law because the prosecutor merely told the jury to follow the law as given in the instructions. 311 Kan. at 70-71.

Here, the prosecutor's hypothetical scenario merely inquired into the prospective jurors' understanding and ability to follow the law as instructed and to render a guilty verdict if the evidence proved the defendant's guilt beyond a reasonable doubt. Such guided comments were like the comments approved by our Supreme Court in *Patterson* and *Pruitt*. And as the court reasoned in *Pruitt*, an instruction from the district court using the word "must" is fundamentally different from a prosecutor's comments in voir dire or closing argument. The prosecutor's comments in voir dire did not misstate the law on jury nullification and thus did not amount to prosecutorial error.

*Comments in closing argument*

Then, during the State's rebuttal closing argument, the prosecutor stated:

"Ladies and gentlemen, if you look at the instruction, *the State has to prove the defendant, Amber, was operating a vehicle under the influence of alcohol to a degree that rendered her incapable of safely driving a vehicle. Not that she was intoxicated; rendered to a degree she's incapable of safely driving a vehicle.* How do you know that? She killed somebody. She was speeding and she killed somebody after consuming alcohol. Lots of alcohol. If she was fine, how'd she hit something in the road? This was not [M.L.'s] fault. The State is not arguing this was intentional, the striking, and keep that in mind.

"Go to the next slide, please.

"Murder in the second degree. So, to establish this charge, to follow the instructions the judge gave you, that on or about 7—August 7, 2021, Amber Alexander, the defendant, in Leavenworth County, Kansas, killed [M.L.] unintentionally but recklessly under circumstances that show extreme indifference to the value of human life. *Drinking. Speeding. Not stopping at an accident*." (Emphases added.)

Alexander claims the prosecutor misstated the law by informing the jury that the jury did not have to prove that Alexander was "intoxicated," but that Alexander was under the influence of alcohol such that she was incapable of safely driving. Alexander

13

argues this comment attached a legal definition to "intoxicated" that lowered the burden of proof to show extreme indifference to the value of life.

The prosecutor, however, made this statement in rebuttal to Alexander's closing argument that the State was required to prove Alexander was intoxicated and there was not enough evidence to show that she was intoxicated. The prosecutor's statements clarified that the State was not pursuing reckless second-degree murder under the theory that Alexander was legally intoxicated, but that Alexander's alcohol consumption rendered her incapable of driving safely. The prosecutor then pointed out that Alexander was speeding, and she did not stop after getting into an accident. According to the State, this evidence proved Alexander's extreme indifference to the value of life.

The prosecutor's statements did not misstate the law or dilute the burden of proof and thus did not amount to prosecutorial error. Because we find no prosecutorial error in either the voir dire or closing argument, we need not address whether any error prejudiced Alexander's due process rights to a fair trial.

CONSTITUTIONALITY OF REPORTING STATUTES

Alexander next claims that K.S.A. 8-1602 and K.S.A. 8-1604 are unconstitutional as applied to her because the statutes' requirements that she provide her name, address, license, and insurance in an accident violates her right against self-incrimination. As a result, Alexander asserts that her conviction for leaving the scene of an accident must be vacated. The State argues that the statutes do not violate Alexander's constitutional rights because the legitimate governmental interests in requiring motorists to provide the required information after an accident outweigh any minimal risk of self-incrimination.

Generally, a defendant must raise a specific constitutional challenge to the statute before the district court to preserve the issue for appeal. *State v. Robinson*, 306 Kan.

14

1012, 1025, 399 P.3d 194 (2017). Before trial, Alexander argued that her charge for failure to remain at the scene of an accident was unconstitutional as applied to her because it violated her right to refrain from self-incrimination. The district court denied the motion. Alexander renewed her argument after the trial, and the district court denied the claim on the merits. Thus, Alexander preserved her claim for appeal.

When the application of a statute is challenged on constitutional grounds, an appellate court exercises unlimited review. *State v. Carr*, 314 Kan. 615, 666, 502 P.3d 546 (2022), *cert. denied* 143 S. Ct. 581 (2023). Alexander asserts that her constitutional challenge implicates her fundamental right to refrain from self-incrimination, demanding a strict scrutiny analysis of the statutes. For the prosecution to prevail under strict scrutiny, the State must show that the statutes are narrowly tailored to serve a compelling government interest. *State v. Ryce*, 303 Kan. 899, 957-63, 368 P.3d 342 (2016). The State responds that "no fundamental constitutional right was infringed," so there is no reason for this court to apply strict scrutiny. We will assume without deciding that Alexander's claim implicates a fundamental constitutional right.

K.S.A. 8-1602(a) requires a driver to remain at the scene of an accident involving injury or death until the driver provides the information required in K.S.A. 8-1604. Under K.S.A. 8-1604(a), the driver of a vehicle involved in an accident resulting in injury or death must provide the police officer with the driver's name, address, vehicle registration number, driver's license, and insurance policy information. The driver must also report the accident to the police. K.S.A. 8-1604(b). Any driver who fails to follow the requirements of K.S.A. 8-1604 is guilty of a severity level 6 felony where the accident resulted in death. K.S.A. 8-1602(a), (b)(4).

The Fifth Amendment to the United States Constitution provides a guarantee against compulsory self-incrimination. U.S. Const. amend. V.; see *Kastigar v. United States*, 406 U.S. 441, 444, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972). This protection

15

applies to Kansas through the Fourteenth Amendment and is codified in section 10 of the Kansas Constitution Bill of Rights. *State v. George*, 311 Kan. 693, 707-08, 466 P.3d 469 (2020). This protection applies not only to statements directly supporting a criminal conviction, "but also embraces those answers which would furnish a link in the chain of evidence needed to prosecute the claimant for a crime." *State v. Delacruz*, 307 Kan. 523, 534, 411 P.3d 1207 (2018) (citing *Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 [1951]). Alexander claims that the requirement to self-report a fatal accident violates her right to refrain from self-incrimination because the information she must report to law enforcement provides a link in the chain of evidence needed to prosecute her for the crime of reckless second-degree murder.

Alexander recognizes there is contrary authority. In *State v. Greenberg*, 4 Kan. App. 2d 403, 607 P.2d 530 (1980), this court addressed the interplay between the Fifth Amendment right to refrain from self-incrimination and the reporting requirements in K.S.A. 1979 Supp. 8-1604(a), which is substantially the same as the current statute. The court applied the balancing test relied on by the plurality in *California v. Byers*, 402 U.S. 424, 91 S. Ct. 1535, 29 L. Ed. 2d 9 (1971) that weighed the risk of self-incrimination against the regulatory interest in keeping roads safe from dangerous, unqualified drivers. The *Greenberg* court reasoned that the statute is aimed at regulatory ends and not at criminal law enforcement. 4 Kan. App. 2d at 410. The court determined that the statute's reporting requirements serve the important public ends of highway safety and financial responsibility for property loss and personal injury, and the statute is reasonably designed to serve that end. 4 Kan. App. 2d at 410. The court held that the statute's potential for self-incrimination is outweighed by the State's interest in enforcing its compulsory insurance laws. 4 Kan. App. 2d 403, Syl. ¶ 7.

Alexander reminds us that one Court of Appeals panel is not bound to follow another panel's ruling. She also distinguishes *Greenberg* because the court in that case did not apply a strict scrutiny analysis to the statute.

16

*Greenberg* does not control the outcome here, but much of its analysis is persuasive. Extending the right against self-incrimination here would interfere with the statutory goals of promoting safety and ensuring responsibility for financial loss and personal injury. Another goal of the statute that was not discussed in *Greenburg* is to prioritize the immediate response for medical treatment to anyone injured in the accident. Compared to these aims, the risk of self-incrimination was minimal. It is important to recognize what information K.S.A. 8-1604 does *not* require a driver to report after an injury accident. Here, had Alexander complied with the statute, it would not have required her to admit whether she had been drinking, whether she had been speeding, or whether she was at fault for the accident. The statute merely requires a driver involved in an injury accident to stay at the scene of the accident and provide the necessary information for identification and insurance purposes. That the report of the accident could be used to identify Alexander in a prosecution for reckless second-degree murder is outweighed by the important public ends the statute serves. K.S.A. 8-1602 and K.S.A. 8-1604 are narrowly tailored to serve a compelling government interest. We conclude the reporting statutes are not unconstitutional as applied to Alexander.

CONSTITUTIONAL CHALLENGES TO KORA

Finally, Alexander claims for the first time on appeal that the district court's order for her to register as a violent offender for 15 years under KORA violates the compelled speech doctrine under the First Amendment. She also claims that KORA violates the Equal Protection Clause of the Fourteenth Amendment because the act allows certain offenders to petition to remove themselves from the registry, but this process is not open to all offenders. The State responds that Alexander failed to preserve her constitutional arguments for appeal. The State also asserts that neither claim is meritorious.

We will first address the preservation issue. Alexander concedes that she did not raise her constitutional claims in district court. Generally, constitutional issues not raised

17

before the district court cannot be raised on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (citing *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 [2015]). There are several exceptions to this rule, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) resolution of the question is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the district court was right for the wrong reason. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

Kansas Supreme Court Rule 6.02(a)(5) (2023 Kan. S. Ct. R. at 36) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. *Johnson*, 309 Kan. at 995. Alexander asserts that both of her constitutional claims meet the first two exceptions for considering a new issue on appeal. But even if the exceptions apply, our decision to address Alexander's constitutional issues for the first time on appeal is prudential. See *State v. Genson*, 316 Kan. 130, 135-36, 513 P.3d 1192 (2022) (finding that appellate court can exercise its discretion to consider whether to apply a prudential exception to the general rule that issues not raised before the district court cannot be raised for the first time on appeal).

Many recent panels of this court have declined to address similar First Amendment KORA claims for the first time on appeal, finding that the claims would require the development of facts outside the appellate record. See *State v. Spilman*, 63 Kan. App. 2d 550, 575, 534 P.3d 583 (2023), *petition for rev. filed* August 7, 2023; *State v. Ontiberos*, No. 124,623, 2023 WL 3032204, at *2-4 (Kan. App. 2023) (unpublished opinion), *rev. denied* 317 Kan. ___ (2023); *State v. Parkins*, No. 125, 134, 2023 WL 3667584, at *6 (Kan. App. 2023) (unpublished opinion), *petition for rev. filed* June 26, 2023; *State v. Pearson*, No. 125,033, 2023 WL 2194306, at *1-2 (Kan. App. 2023) (unpublished opinion), *petition for rev. filed* March 20, 2023; *State v. Ford*, No. 124,236, 2023 WL 1878583, at *19 (Kan. App. 2023) (unpublished opinion), *rev. granted* 317

Kan. ___ (2023); *State v. Jones*, No. 124,174, 2023 WL 119911, at *3-6 (Kan. App. 2023) (unpublished opinion), *rev. granted* 317 Kan. ___ ( 2023).

Likewise, panels of this court have declined to address similar Fourteenth Amendment Equal Protection challenges for the first time on appeal. See *Spilman*, 63 Kan. App. 2d at 575; *State v. Miller*, No. 125,213, 2023 WL 5811770, at *6 (Kan. App. 2023) (unpublished opinion); *State v. Harpe*, No. 124,732, 2023 WL 5992237, at *9 (Kan. App. 2023) (unpublished opinion). Even if Alexander can show standing to raise this issue, review of her Equal Protection claim invokes rational basis scrutiny. See *State v. Huerta*, 291 Kan. 831, 834, 247 P.3d 1043 (2011) (rational basis test applied in equal protection challenge to a criminal statute). To apply the rational basis test, this court would need to determine whether similarly situated offenders are treated differently, and whether these classifications bear a rational relationship to a legitimate government goal. *Crawford v. Kansas Dept. of Revenue*, 46 Kan. App. 2d 464, 471, 263 P.3d 828 (2011). "Simply pointing out that the [classification] might not be rationally related to the state objectives sought under one set of facts is not enough" for this court to deem a classification unconstitutional for equal protection purposes. *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 851, 942 P.2d 591 (1997). Instead, Alexander would bear the burden of disputing every reasonable basis to support the classification. *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 253, 930 P.2d 1 (1996).

Following the lead of several prior panels of this court, we exercise our discretion to decline to address Alexander's constitutional challenges to KORA for the first time on appeal. As a result, we have no basis to set aside the district court's order for Alexander to register as a violent offender for 15 years under KORA.

Affirmed.

19