No. 55,466

STATE OF KANSAS, *Appellee*, v. MICHAEL A. ROADENBAUGH,
*Appellant.*

(673 P.2d 1166)

Opinion filed December 2, 1983.

*Janet S. Helsel,* of Offices of Otto J. Koerner, of Wichita, was on the brief for appellant.

*Geary N. Gorup,* assistant district attorney, *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Michael A. Roadenbaugh appeals his jury trial conviction of second-degree murder (K.S.A. 21-3402). The victim was defendant's mother, Mrs. Vivian Lawson. It is undisputed defendant killed Mrs. Lawson on October 21, 1981, in her Wichita residence. An insanity defense was presented at trial (K.S.A. 22-3219).

The first issue is whether the trial court erred in admitting a statement made by the defendant to the arresting officer.

Some additional facts relative to the slaying need to be stated. On October 19, 1981, defendant moved into the residence of his mother and stepfather (Vivian and Virgil Lawson). Defendant had a history of mental difficulties and alcohol abuse. When Mr.

Lawson returned home from work at approximately 4:00 p.m. on October 21, 1981, he discovered the body of his wife. She had been shot twice—once in the chest and once in the back. The defendant was not in the home. An ambulance was summoned by Mr. Lawson and a police officer followed the ambulance to the scene.

Mr. Lawson advised the officer he owned a .22 caliber revolver and the officer observed the same in a bedroom drawer. Two empty .357 caliber cartridges were on a coffee table in the living room. Mr. Lawson advised the officer he did not own a weapon the empty cartridges would fit, but defendant might own such a gun. Mr. Lawson also gave the officer information concerning the defendant which caused the officer to believe defendant was a suspect in the slaying. The police dispatcher broadcast a physical description of defendant, his name, and the fact he might be carrying a brown suitcase. The broadcast further advised defendant might be armed with a .38 or .357 caliber revolver and stated he was a suspect in a homicide.

Later the same day, a police officer who had heard the broadcast saw a man fitting the description, carrying a suitcase, approaching the City Building at 455 North Main in Wichita. The officer asked the man to state his name and the man identified himself as Michael Roadenbaugh. Upon being requested to do so by the officer, defendant put the suitcase on the ground and placed his hands on the west wall of the City Building. The officer started patting defendant down and inquired "where his weapon was." The officer testified he made the inquiry for his own protection. In response to the question defendant removed his right hand from the wall and pointed toward the suitcase. Additionally, he verbally stated the weapon was in the suitcase. The officer then finished patting down the defendant, handcuffed him, picked up the suitcase, and accompanied defendant to police department offices in the City Building.

The defendant objected to the officer being permitted to testify as to defendant's gesture and verbal statement relative to the location of the gun. Defendant contends the officer's question which occasioned these responses was a custodial interrogation without benefit of a *Miranda* warning and hence was violative of his Fifth Amendment right against self-incrimination.

We do not agree.

In *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), 10 A.L.R.3d 974, the U.S. Supreme Court in its landmark decision proclaimed:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.

*Miranda,* however, does not stand for an absolute proposition law enforcement officers may never ask a citizen any question without previously informing the citizen of his constitutional rights, such as the right to remain silent. As the *Miranda* court observed, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." 384 U.S. at 477-78.

A question propounded by a law enforcement officer during investigatory questioning, as contrasted to during custodial interrogation, does not require the previous giving of a *Miranda* warning. In *State v. Bohanan,* 220 Kan. 121, 551 P.2d 828 (1976), the Court, through Justice Prager, distinguished between custodial and investigatory interrogation as follows:

"Since *Miranda* this court has developed a number of general guidelines to be applied in determining whether or not a custodial interrogation has taken place. In *State v. Brunner,* 211 Kan. 596, 507 P.2d 233, we held that a person who has not been arrested is not in police custody unless there are *significant* restraints on his freedom of movement which are imposed by some law enforcement agency. We have also declared that a general questioning of citizens in the course of an investigation in the fact finding process does not constitute custodial interrogation. We defined an investigatory interrogation as the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way. (*State v. Frizzell,* 207 Kan. 393, 485 P.2d 160.) In *State v. Carson,* 216 Kan. 711, 533 P.2d 1342, Syl. 5, we suggested that circumstances bearing on whether a person questioned was subjected to 'custodial interrogation' requiring *Miranda* warnings can be classified under the following general headings: (1) The nature of the interrogator; (2) the nature of the suspect; (3) the time and place of the interrogation; (4) the nature of the interrogation; and (5) the progress of the inves-

tigation at the time of interrogation. In *Carson* we also stated that the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for a *Miranda* warning but it may be one of the determinative factors in arriving at a decision whether such a warning is needed." 220 Kan. at 128-29.

Summarizing a decade of case law on this matter, this court, in *State v. Taylor*, 231 Kan. 171, 642 P.2d 989 (1982), recently observed:

"The admissibility of appellant's statements depends upon whether they were the result of a 'custodial interrogation' or an 'investigatory interrogation.' A custodial interrogation, which requires that *Miranda* warnings be given, involves 'significant restraints on [a subject's] freedom of movement which are imposed by some law enforcement agency.' *State v. Greenberg*, 4 Kan. App. 2d 403, 405, 607 P.2d 530, *rev. denied* 228 Kan. 807 (1980); *State v. Brunner*, 211 Kan. 596, Syl. ¶ 2, 507 P.2d 233 (1973). In *State v. Bohanan*, 220 Kan. 121, 128, 551 P.2d 828 (1976), it was recognized, 'that general on-the-scene questioning as to facts surrounding a crime or *other general questioning of citizens in the fact finding process* does not constitute custodial interrogation requiring a *Miranda* warning.' An investigatory interrogation, requiring no warning, is defined as 'the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way.' 220 Kan. at 128." 231 Kan. at 172-73.

However, we do not believe the question of custodial or investigatory interrogation even arises in the circumstances herein. The officer had a clear right, for personal safety purposes, physically to search the defendant for weapons. *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968). See also K.S.A. 22-2402(2). In so doing it is permissible to spread-eagle a suspect for the pat down or frisk and then feel the suspect's person for weapons. Surely a verbal question as to the location of a weapon is far less intrusive upon a suspect.

A similar issue was presented in *People v. Toler*, 45 Mich. App. 156, 206 N.W.2d 253 (1973). In addressing the propriety of the police officer's question about the location of the firearm, the Michigan Court of Appeals said:

"There is no dispute here concerning the issue of custody or lack of *Miranda* warnings. The defendant had been shot, handcuffed, and patted down for weapons; he was in custody. No warnings were given. However, there is a serious question as to whether this was the type of interrogation that *Miranda* was intended to cover.

"Generally, the police cannot ask an arrested suspect any questions without first warning him of his constitutional rights. The case at bar is, however, a limited exception to this general rule. *People v. Ramos*, 17 Mich. App. 515, 518

[, 170 N.W.2d 189] (1969), spoke to this issue in light of *Terry v. Ohio,* 392 U.S. 1; 88 S.Ct. 1868; 20 L.Ed.2d 889 (1968):

" 'The police were not obligated to advise the defendant of his constitutional rights before making an effort to disarm him to prevent him from injuring the police officers or someone else present. Police officers are not required to take unnecessary risks in the performance of their duties.'

In *Ramos* defendant's wife had told the police that defendant had a gun, with which he had threatened her. The police approached defendant in a bar and asked, 'Where is the gun, John?' Defendant responded that it was in his belt. Both the conversation and the weapon were properly admitted at this trial for carrying a concealed weapon.

"The facts in the case at bar are somewhat different. Here the police knew defendant had had a gun because they saw it in his hand when he ran into the scout car. Defendant had not stopped when ordered to by the police but instead had tried to escape. Defendant was under arrest when questioned. Defendant was not as dangerous to the police when questioned as *Ramos* potentially was because defendant had already been wounded, handcuffed, and patted down for weapons before the question was asked. The difference of facts does not, however, necessarily dictate a different result." 45 Mich. App. at 159-60.

Finally:

"Here there was no series of questions aimed at gathering evidence to be used later against the defendant. There was only a single question probably aimed at protecting the officers. The objected-to matter pertained to the location of the gun, previously seen by the officers—the logical import of this is that the officers were concerned with their safety and not with building a case against defendant." 45 Mich. App. at 161.

In *Ballew v. State,* 246 Ark. 1191, 441 S.W.2d 453 (1969), defendants, having used a shotgun in their crime, were convicted of assault with intent to kill. Defendants challenged the admission of the shotgun into evidence at trial and on appeal. Defendants' argument was predicated upon the point law enforcement officers asked them where the shotgun was before they advised them of the *Miranda* warnings. In rejecting defendants' argument the Arkansas Supreme Court commented:

"When the officers discovered the appellants they were ordered to stop running and walk toward the officers from a distance of approximately 500 feet, with their hands raised. It was necessary for the appellants to wade a shallow 'seep ditch' at a levee. At times the weeds and brush were of such a height that the appellants were partially obscured. When the appellants were approaching the officers one of them stooped down. *They were asked the whereabouts of the shotgun. The officers were told that it was nearby in a 'hollow log.'* It was found there contemporaneous with the arrest. It is argued that this procedure is in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966), which requires that the accused must be warned of his constitutional rights against self-incrimination before any

interrogation is begun. In other words, it is insisted that a *Miranda warning* should have preceded the inquiry.

"We have recently held that a *Miranda* warning is not required to be given in every instance the moment a suspect is taken into custody. *Edington v. State,* 243 Ark. 10, 418 S.W.2d 637 (1967); *Haire v. State,* 245 Ark. 293, 432 S.W.2d 828 (1968). In those cases we held that a spontaneous statement was admissible. In the case at bar, we think the statement that the shotgun was in a 'hollow log' was in the nature of a spontaneous admission. We do not agree that *Miranda* can be construed or is intended as being applicable in these circumstances.

"Further, in the case at bar the officers, based upon probable cause, were effecting the legal arrest of the appellants who were fleeing from the scene of an alleged crime which had recently been committed by the use of a shotgun. In the circumstances it must be said that *officers had a right to inquire of the presence or whereabouts of the weapon for their own safety as well as to prevent escape and the destruction of evidence as being incidental to a lawful arrest.*" 246 Ark. at 1195-96. (Emphasis supplied.)

In *People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 409 N.E.2d 958, *cert. denied* 449 U.S. 1018 (1980), the same question was presented and the New York court reasoned:

"Street encounters between private citizens and law enforcement officers are inherently troublesome. This is so because two competing, yet equally compelling, considerations inevitably clash, to wit: the indisputable right of persons to be free from arbitrary interference by law enforcement officers and the nondelegable duty placed squarely on the shoulders of law enforcement officers to make the streets reasonably safe for us all. While in an ideal society the two might never clash, a quick glance through our newspapers reveals that our society is far from perfect. Thus, the judiciary is put to the task of balancing these competing considerations, so that they can reasonably coexist." 51 N.Y.2d at 19.

Continuing:

"[T]he single question posed by Dieterich—'Where is the gun?'—was certainly justified in order to protect the officers' welfare. Courts simply must not, in this difficult area of street encounters between private citizens and law enforcement officers, attempt to dissect each individual act by the policemen; rather, the events must be viewed and considered as a whole, remembering that reasonableness is the key principle when undertaking the task of balancing the competing interests presented." 51 N.Y.2d at 22-23. (Emphasis supplied.)

Concluding:

"We are of the opinion that this single question did not constitute custodial interrogation, and, thus, the response given by defendant—'It's right here'—need not be suppressed even though defendant was not informed of his constitutional rights before answering. (See *People v. Huffman,* 41 N.Y.2d 29, [390 N.Y.S.2d 843, 359 N.E.2d 353 (1976)].)" 51 N.Y.2d at 23, n. 8.

See also *United States v. Castellana,* 500 F.2d 325 (5th Cir. 1974), and *State v. Lane,* 77 Wash. 2d 860, 467 P.2d 304 (1970).

We conclude the officer's question, for his personal safety reasons, relative to the location of the gun before giving the *Miranda* warnings was not violative of defendant's constitutional rights and the trial court did not err in refusing to suppress defendant's response thereto.

For his second issue defendant contends the prosecution's examination of a police officer constituted prosecutorial misconduct so gross as to mandate the granting of a new trial. We have reviewed the record and conclude the trial court did not err in refusing to grant a mistrial or new trial on the grounds of prosecutorial misconduct.

For his third issue defendant challenges the sufficiency of the evidence in two respects: (a) whether the State adequately proved defendant's sanity; and (b) whether the State adequately established the chain of custody of a murder bullet.

We shall first consider the issue as it relates to sanity. Preliminarily it should be noted neither side presented expert testimony relative to defendant's sanity.

Defendant contends the trial court erred in not granting his motion for acquittal after the close of State's case as there appeared evidence within the State's presentation which drew defendant's sanity into question and the State failed to provide sufficient evidence to establish defendant was sane. Specifically, the defense contends defendant's sanity was brought into doubt during the State's presentation by the testimony of a police officer who related to the court Mr. Roadenbaugh had been in and out of hospitals for psychiatric problems, was alcoholic, was having problems holding jobs, and was receiving some type of social security benefits or disability payments. In light of this testimony the defense argues:

"Since the government introduced no direct evidence of defendant's sanity at the time of the crime, a reasonable doubt existed as to defendant's sanity. Consequently, the Court should have sustained defendant's motion for acquittal."

In *State v. Nemechek*, 223 Kan. 766, 576 P.2d 682 (1978), Mr. Nemechek similarly argued he was entitled to acquittal at the conclusion of the State's evidence as there was an inference of insanity and the State had not presented any psychiatric testimony in its case in chief to establish defendant was sane at the time of the murders. 223 Kan. at 767. In rejecting defendant's appeal this Court observed:

"There is a presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case. (*State v. Coltharp,* 199 Kan. 598, 433 P.2d 418 [1967].) The prosecution is never required to introduce evidence of sanity until some evidence is introduced which, if believed by the jury, could raise a reasonable doubt as to a defendant's sanity at the time the offense was committed. (See *State v. Penry,* 189 Kan. 243, 368 P.2d 60 [1962]; *Wilson v. United States,* 288 F.2d 121 [D.C. Cir. 1960]; *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 [1961]; *People v. Smothers,* 2 Ill. App. 3d 513, 276 N.E.2d 427 [1971], *aff'd* 55 Ill. 2d 172, 302 N.E.2d 324 [1973].)" 223 Kan. at 767.

We conclude the police officer's brief reference to defendant's background did not raise a reasonable doubt as to defendant's sanity at the time the offense was committed so as to require the State to introduce evidence of sanity in its case in chief. Accordingly, denial of the motion for acquittal at the close of the State's evidence was not error. Additionally, after denial of the motion, the defendant then presented his evidence. In such circumstances a defendant waives any error in the denial of the motion. *State v. Blue,* 225 Kan. 576, 578, 592 P.2d 897 (1979).

Although it is unclear from his brief, it appears the defendant may also be challenging the sufficiency of the evidence of his sanity for submission to the jury and to support the verdict. Defendant did not renew his motion for acquittal at the close of all evidence. The matter did not arise again until prior to sentencing when a motion was filed for acquittal or in the alternative for a new trial. We examined the record and have no hesitancy in concluding denial of this motion was not error.

We should now consider this issue as it relates to sufficiency of the chain of custody of a bullet.

The bullet was removed by a physician during the autopsy. The physician testified he placed his initials on the bullet and the initials were still visible. The firearms examiner testified only his own initials appeared on the bullet.

Defendant contends this raises a question as to the authenticity of the bullet and that it should not have been admitted. Further, he argues "[w]ithout exhibit 16 [the bullet], the state's evidence would have been insufficient since it was established that that was the fatal bullet." We do not agree. The chain of custody was sufficiently established to allow admission of the exhibit. Additionally, as noted by the State:

"Even assuming the bullet slug should be disregarded as evidence, it was not needed for a conviction. When a defendant moves for judgment of acquittal at the

close of all evidence, then the court may consider not only the prosecution evidence, but also the defense evidence indicating guilt. The defendant in his testimony admitted killing the victim, that he knew it was wrong for people to kill one another (although he thought it was okay for him to kill his mother), that after killing her he reloaded the gun in case he had trouble with police, and that he knew that he'd get in trouble with the police for the killing . . . . The defendant's testimony alone establishes every element of the offense and of the defendant's legal sanity at the time of the offense. The evidence of defendant's killing of the victim was undisputed; only his sanity was questioned. The defendant presented lay opinion testimony of the defendant's insanity (in general), but the defendant's own admissions refute any belief of legal insanity by criminal law standards despite the opinions of some of his friends or relatives."

We find this issue, in its entirety, to be without merit.

Finally, defendant raises a multifaceted challenge to the instructions.

First he attacks the insanity instruction which is a hybrid of PIK Crim. 2d 54.10 and the instruction approved by this court in *State v. Andrews*, 187 Kan. 458, 465, 357 P.2d 739 (1960), *cert. denied* 368 U.S. 868 (1961). The instruction ended with PIK Crim. 2d 54.10-A. Defendant argues only PIK Crim. 2d 54.10 should have been given. We have reviewed the instruction as given and find it sufficiently states the law of this state. See generally Note, *Criminal Responsibility: Changes in the Insanity Defense and "Guilty But Mentally Ill" Response*, 21 Washburn L.J. 515 (1982).

Defendant next contends the trial court erred in not instructing on voluntary manslaughter as a lesser included offense. Voluntary manslaughter (K.S.A. 21-3403) requires an element the killing was done in the heat of passion or upon a sudden quarrel. There was no evidence of either in this case. In fact, defendant's own testimony as to the pertinent events negates any theory the killing was done in the heat of passion or upon a sudden quarrel. We find no error in the trial court's refusal to instruct on voluntary manslaughter as a lesser included offense.

Next defendant argues the trial court erred in including the general *Allen* instruction to the jury in the set of instructions given before the jury retired.

In *State v. Oswald*, 197 Kan. 251, 417 P.2d 261 (1966), after *Allen v. United States*, 164 U.S. 492, 41 L.Ed. 528, 17 S.Ct. 154 (1896), this court approved such an instruction, 197 Kan. at 260, though we indicated it was better for the instruction to be given *before* the jury retires which is exactly what occurred herein. In

*State v. Boyd,* 206 Kan. 597, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972), this court reiterated if such an instruction was to be given, trial courts were well advised to submit the same before the jury retired, not afterwards. 206 Kan. at 601. See also *State v. Scruggs,* 206 Kan. 423, 425-26, 479 P.2d 886 (1971); and PIK Crim. 2d 68.12.

The trial court did not err in giving the jury an *Allen*-type instruction before it retired.

Finally, defendant contends the general intent instruction was erroneous, basing his complaint on *State v. Rupe,* 226 Kan. 474, Syl. ¶ 3, 601 P.2d 675 (1979). We find no merit on this point.

The judgment is affirmed.