NOT DESIGNATED FOR PUBLICATION

No. 112,262

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GUY PALMER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER, JR., judge. Opinion filed January 8, 2016. Affirmed.

*Peter Maharry*, of Kansas Appellant Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., GARDNER, J., and BURGESS, S.J.

*Per Curiam*: Guy Palmer walked into the county jail and asked to be arrested. After a back-and-forth exchange with one of the officers there, he revealed that he had killed his wife, Debra Palmer. The case proceeded to jury trial, where Palmer testified that he did not remember killing Debra, just listening to her describe her affair with another man before emerging from a haze and discovering blood on his hands. A jury convicted him of second-degree murder. We affirm.

1

One morning while she worked in the front lobby of the Sedgwick County Jail, a man approached Fabiola Torres and said he needed to be arrested. According to Torres, the man—later identified as Palmer—appeared distressed and anxious. He also told Torres that he needed a psychiatrist and an attorney. On the advice of another officer, Torres called 911, and as she spoke to dispatch, Sergeant Jeremy Woodson approached Palmer. To Woodson, Palmer appeared tired, "slightly disheveled," and possibly homeless. He paced nervously. After Woodson introduced himself, Palmer again said that "he needed to be booked into jail." Suspecting that Palmer simply wanted somewhere to stay overnight, Woodson explained that he needed a reason to arrest him. Palmer again replied that he just needed to be booked into the jail.

After Woodson patted Palmer down, they engaged in a back-and-forth before Palmer admitted to hurting someone. Woodson attempted to elicit more information in hopes of rendering assistance to this individual, but Palmer resisted, eventually telling Woodson that he had "come to the wrong place." When Woodson pressed him again, reiterating that he needed a reason to arrest Palmer and that he could call to assist the injured person, Palmer finally admitted, "[W]ell, I killed my wife."

Uncertain as to the truth of this statement, Woodson decided to bring Palmer back into a more secure portion of the jail that he and others referred to as the lobby. While they waited for an officer from the Wichita Police Department to arrive, Woodson tried to gather more information about Palmer's wife. Palmer said she was at their home but provided few details. However, he did provide his personal information.

A short time later, Officer Juan Atondo of the Wichita Police Department arrived. Atondo determined that the address Palmer gave to Woodson actually existed before speaking to Palmer, who again stated that he killed his wife. Palmer also asked Atondo to

place him in handcuffs. Atondo elicited more information from Palmer, including his wife's name, date of birth, and the nature of their relationship. In fact, Palmer detailed some of their marital issues to Atondo, including his wife's affair. Palmer said his wife was in the basement of the home, along with "whatever he used" to kill her. When Atondo discovered from the officers investigating Palmer's home that Palmer's wife was indeed dead in the basement, Palmer reiterated that he had killed her. Atondo later testified that Palmer behaved "[u]pset, angry" when discussing his wife but otherwise was "very cordial" and occasionally tearful and remorseful.

Later, while the other officers completed their reports, Torres again spoke with Palmer, this time while they both sat in the lobby. Torres attempted to talk to Palmer about innocuous topics like his job, but as they spoke, "everything reverted back to his wife." Torres later testified that whenever Palmer steered the conversation back to his wife, she attempted to redirect him onto other topics. However, he continued to talk about Debra, including how "she would call him and antagonize him . . . about the affair that she had been having with another individual" while he went out with friends. At one point, he even remarked that "he felt like she wanted him to kill her."

Ultimately, the State charged Palmer with the first-degree murder of his wife Debra. Prior to trial, Palmer filed a motion to suppress all the statements he made at the jail as he never received his *Miranda* warnings from the officers there. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). After a hearing, the district court determined that all the statements Palmer made to the officers, as well as to a nurse who later examined him, were admissible.

In addition to Torres, Woodson, and Atondo, crime scene investigator Andrew Maul testified at trial about the crime scene, including the knife and blood spray discovered there. Karen Wilson-Diehl, a forensic nurse examiner, testified about performing a forensic examination of Palmer and collecting evidence from him. Wilson-

3

Diehl testified that as she examined Palmer, he volunteered some information about his relationship with his wife, like when she would send him to the basement. Detective Dan Harty discussed his involvement in the investigation, including the collection of evidence. Medical examiner Doctor Jaime Oeberst testified about the cause of Debra's death, revealing that Debra died of six stab wounds, or "sharp force injuries," in various places on her body. The parties also stipulated that blood consistent with Debra's was discovered on the knife and a baseball cap Palmer wore.

After the State rested, Palmer testified on his own behalf. He explained that he and Debra had been in a relationship since about 1991, marrying and divorcing in the early 1990s before deciding to hold themselves out as married again in 2005. Palmer estimated that he and Debra split up about 10 times during the course of their relationship. In 2012, Palmer began to suspect Debra of cheating on him, as she started leaving work in the afternoon and sometimes stayed out until the wee hours of the morning. When confronted, however, Debra denied the affair. After Debra stayed out all night in December 2012, Palmer again confronted her, but she refused to talk to him. Palmer left the house and drove around before returning home without talking to anyone.

Once at home, Palmer headed down to the basement and Debra came down a few minutes later. According to Palmer, they started a conversation, but Debra's cell phone interrupted them. Based on her side of the conversation, Palmer believed she was speaking to a man. After she hung up, her brother-in-law called, and they spoke for some time. Palmer testified that by the time Debra ended the second call she was angry. At that time, Debra informed Palmer "she had been sleeping with a black man and that she knew when she told [Palmer] that [he] wouldn't want to have anything to do with her anymore." Palmer asked why she had cheated on him, and according to Palmer's testimony, she replied that "she wanted a man who would listen to her. She wanted a man to talk to her. She wanted a man who would sleep with her. She wanted a man who would make love to

4

her. [She] wanted a real man." Palmer testified that this was the first time she had ever said anything like this to him.

The very next thing Palmer recalled was standing over Debra with bloody hands and a knife. He knew at that time she was dead.

Palmer described his recollection after that point as "fuzzy." He recalled going upstairs to wash his hands, as well as putting the knife back in the basement and changing his clothes. He remembered leaving the home, calling and meeting with his son, and driving to Arkansas to find his aunt. In the end, though, he realized he did not know how to find her and returned to Kansas, heading to the jail.

Ultimately, Palmer testified that he never planned on killing Debra. But he also acknowledged that many of their breakups concerned affairs that they had both had in the past. Palmer denied that Debra was afraid of him or that he was ever angry at her. In fact, Palmer testified that Debra's statements to him about the affair only "made [him] sad."

Debra's brother-in-law, Roger Matthews, testified as a rebuttal witness for the State. He explained that Debra and Palmer's living arrangement and relationship was "[a]wkward." He recalled witnessing Palmer's general "anger and frustration," and him swearing at Debra and "[c]all[ing] her vicious names." Matthews also testified that in the days immediately before Debra's death, Palmer drove by the house, insisting that he needed to talk to Matthews. Matthews believed Palmer's anger stemmed from Debra's affair. According to Matthews, Debra feared Palmer and once said that "if anything ever happens to me you know [Palmer] did it."

The man Debra had an affair with, Donald Baker, testified that on the day before her death, Debra called him to tell him that she had revealed their affair to Palmer and

that she was frightened of him. Baker, too, had witnessed Palmer being angry with Debra before.

Prior to closing arguments, the district court and parties reviewed the jury instructions, including Palmer's request for a voluntary manslaughter instruction. The State argued that the evidence at trial did not support the requested instruction, while Palmer insisted that the evidence showed that Debra questioned his "very manhood" in such a way that anyone would feel angry. The district court denied Palmer's request.

The jury convicted Palmer of the lesser-included offense of second-degree murder. The district court sentenced him to 285 months' imprisonment. He timely appealed.

ANALYSIS

*Was Palmer entitled to a jury instruction on the lesser-included crime of voluntary manslaughter?*

Palmer first objects to the district court's failure to give the requested voluntary manslaughter instruction. Palmer insists that the facts supported the instruction and that the district court erred in not including it. Our Kansas courts employ a four-step process when addressing challenges to jury instructions:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless.' [Citation omiteed.]"
> *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

6

Palmer clearly requested the voluntary manslaughter instruction during the instruction conference. Clearly, this issue is reviewable. The analysis for determining whether the instruction is legally appropriate is equally straight-forward, as our Kansas Courts "have held on numerous occasions that voluntary manslaughter is a lesser included offense of both first-and second-degree murder as a 'lesser degree' of those crimes under" what is now K.S.A. 2014 Supp. 21-5109(b)(1). *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008). The question of whether the district court erred turns on the factual appropriateness of the proposed instruction.

K.S.A. 2014 Supp. 22-3414(3) provides in relevant part: "In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." To put it another way, "'there must be actual evidence in the record, together with reasonable inferences to be drawn from that actual evidence, that would reasonably support a conviction for the lesser crime.' [Citation omitted.]" *State v. Hayes*, 299 Kan. 861, 865, 327 P.3d 414 (2014).

In Kansas, voluntary manslaughter is defined in relevant part as knowingly killing a human being either "[u]pon a sudden quarrel or in the heat of passion." K.S.A. 2014 Supp. 21-5404(a)(1). Boiled down, the offense is comprised of two parts: "an intentional killing and legally sufficient provocation." *Hayes*, 299 Kan. at 864. In his brief, Palmer focuses on whether there existed enough evidence of provocation to sustain a voluntary manslaughter conviction.

While analyzing a question of provocation, this court applies an objective test and asks whether the provocation was "'sufficient to cause an ordinary man to lose control of his actions and reason.' [Citation omitted.]" *Gallegos*, 286 Kan. at 875. Relevant to this consideration, heat of passion is defined as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger,

hatred, furious resentment, fright, or terror,'" and is based "'on impulse without reflection.' [Citation omitted.]" *Hayes*, 299 Kan. at 864. Similarly, a sudden quarrel arises from "an unforeseen angry altercation, dispute, taunt, or accusation." *State v. Wade*, 295 Kan. 916, Syl. ¶ 4, 287 P.3d 237 (2012). Any confrontation that is orchestrated or planned "is the antithesis of a sudden quarrel." 295 Kan. 916, Syl. ¶ 4. But that said, "[m]ere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *Hayes*, 299 Kan. at 866. Furthermore, "[m]ere evidence of an altercation . . . does not alone support a finding of sufficient provocation." *State v. Haddock*, 257 Kan. 964, 987, 897 P.2d 152 (1995), *abrogated on other grounds by State v. James*, 276 Kan. 737, 79 P.3d 169 (2003).

In *Gallegos*, the defendant's nephew Andrew called him to pick him up from a party after he and another man, Pedro Reyes Cruz, had an argument. After locating Andrew, Gallegos drove to Cruz' home and had Andrew knock on the front door. Gallegos and Cruz started arguing about Andrew and Cruz' confrontation, which culminated in Gallegos shooting Cruz. On appeal, Gallegos argued that the district court should have instructed the jury on voluntary manslaughter, but our Supreme Court rejected this argument. Instead, the court determined that "evidence of an argument between Gallegos and Cruz immediately before Cruz' death fails to demonstrate any legally sufficient provocation." 286 Kan. at 875. The court reasoned that the "brief verbal exchange" between the two men—one that occurred while Gallegos stood on the sidewalk and Cruz on the front porch—was insufficient to support a conviction for voluntary manslaughter. As such, an instruction on this lesser-included offense was unwarranted. 286 Kan. at 875.

In another case, the defendant shot a woman he had previously lived with after she "said he was a bum and no good." *State v. Dixon*, 252 Kan. 39, 41, 843 P.2d 182 (1992), *superseded by statute on other grounds*, *State v. Shannon*, 258 Kan. 425, 905 P.2d 649 (1995). Dixon had approached the house with intentions to scare her, but she repeatedly

told him to leave "in strong terms." 252 Kan. at 40. The woman survived the attack, and Dixon was convicted of attempted first-degree murder. On appeal, our Kansas Supreme Court determined that a jury instruction for attempted voluntary manslaughter was inappropriate because the woman did not threaten Dixon's safety and her "words did not justify an assault." 252 Kan. at 46.

Here, even viewing the evidence in the light most favorable to Palmer, the facts do not support a finding of sufficient provocation to justify a voluntary manslaughter instruction. According to Palmer, Debra stayed out all night immediately before the murder, and after she refused to speak to him, he drove around before returning home. Once home, Palmer and Debra began the conversation that, after some interruption, ended in Debra revealing her affair. Up until this point, Palmer only suspected that Debra might be cheating on him. During the conversation, Debra angrily informed Palmer that she "wanted a real man." The next thing Palmer knew, his hands were bloody and Debra was dead.

Nothing in the record suggests that the interaction escalated past Debra's heated words. In fact, Palmer testified that Debra was unarmed and that, as they spoke, he was "sitting on the couch and she was sitting on the love seat." Nothing in Palmer's account of the altercation indicates that Debra threatened him or escalated the interaction past venomous words. This description of Palmer's final conversation with Debra resembles the verbal exchanges in both *Gallegos* and *Dixon*—exchanges that, despite their heated nature, failed to justify a voluntary manslaughter instruction. See *Gallegos*, 286 Kan. at 875; *Dixon*, 252 Kan. at 41.

Additionally, nothing in Palmer's testimony suggests that he felt the sort of "'intense or vehement emotional excitement'" emblematic a man fueled by the heat of passion. *Hayes*, 299 Kan. at 864. Palmer emphasized that he was never angry at Debra and that their altercation only "made [him] sad." And although he testified that Debra was

9

angry, he explained the anger was directed at her brother-in-law, not him. Palmer's emotional state certainly falls short of the high level of emotional excitement required for a voluntary manslaughter instruction.

On appeal, Palmer points to *State v. Harman*, No. 93,118, 2006 WL 2337210 (Kan. App.) (unpublished opinion), *rev. denied* 282 Kan. 793 (2006), in support of his proposition that Debra's revelations about the affair provided sufficient provocation. Although that opinion fails to set out the facts in detail, it appears that Harman discovered his wife and another man entangled in an intimate moment in that other man's truck. After recognizing that "the circumstances in the present case (a husband finding his wife with another man) might generally be considered sufficient provocation," this court determined that the defense at trial was inconsistent with the requested instruction and that Harman never claimed to be "suddenly enraged or angry" by what he saw. 2006 WL 2337210, at *2.

Here, Palmer never witnessed the affair. Instead, Debra only admitted to cheating on him—a far cry from discovering her in the arms of another man. To say that her strong words about wanting a different kind of man than Palmer are equal in emotional impact as discovering the affair in full swing directly conflicts with the long-standing rule in Kansas that words and gestures alone are insufficient to support a finding of adequate provocation. See *Hayes*, 299 Kan. at 866.

Viewed in the light most favorable to Palmer, the evidence at trial does not reasonably support a conviction for voluntary manslaughter. Although the facts do indicate that Palmer was affected by Debra confirming her affair and her choice words on their own relationship, Palmer's testimony makes clear that their conversation never escalated beyond words and never caused him to feel any emotion other than sadness. None of this evidence is sufficient to support an instruction of voluntary manslaughter. While there might be a conceivable situation where extreme words of a revelatory nature

10

delivered in a vicious or cruel manner might be considered sufficient provocation, this is not that case. See *State v. Paulson*, No. 108,795, 2015 WL 6444314, at 5-6 (Kan. App. 2015) (unpublished opinion). Because the facts do not support the instruction, the district court did not err in denying Palmer's request.

*Did the district court err in not suppressing the statements Palmer made to law enforcement?*

Next, Palmer challenges the admissibility of the statements he made to law enforcement officers within the Sedgwick County jail. Because he never received *Miranda* warnings, he reasons that the statements are all inadmissible. Palmer moved to exclude these statements, but the district court rejected his motion.

### The hearing before the district court

At the hearing, Torres testified first, again detailing her conversations with Palmer and his initial request to be arrested. As for her second conversation with Palmer, Torres testified that she attempted to keep him calm by talking about innocuous topics such as Palmer's job. However, Palmer continually steered the conversation back to Debra. Although she knew that Palmer had admitted to killing Debra, Torres never asked any questions about the crime and focused exclusively on small talk.

Woodson next testified about his encounter with Palmer, which began in the unsecured foyer area. Like with Torres, Palmer initially told Woodson that he needed to be put in jail. Palmer also said he needed a lawyer and a psychiatrist. The two engaged in a long back-and-forth conversation, during which Palmer eventually admitted that he hurt someone but without providing details. Palmer did allow Woodson to pat him down and provided some identifying information. Otherwise, Palmer repeated the same battery of requests (arrest, lawyer, psychiatrist) until he admitted to killing his wife.

11

Because of Palmer's serious demeanor, Woodson decided he needed more information and asked Palmer to join him in the secured lobby area. At the hearing, Woodson explained that although the lobby is locked from the outside, someone inside the lobby can easily exit. Woodson actually brought Palmer in through the open exit doors and sat him in one of the lobby chairs. In the lobby area, Palmer provided a bit more information about his wife, such as where she was located and how to enter his home. However, Woodson had no idea how true this information actually was.

When Atondo arrived at the jail, he took over the investigation, and Woodson's involvement became minimal. Woodson noted that his questions focused on the welfare of Palmer's wife and not on any of the details surrounding her death. Woodson admitted that Palmer had asked for an attorney but emphasized that he kept asking about Debra "so we could go do a welfare check on her."

In his testimony, Atondo explained that he first spoke to Woodson, who briefed him on the situation. When he approached Palmer, however, Palmer "looked to be upset" with "an angry expression about his face." In order to defuse the situation, Atondo "told him to take it easy" and asked what was going on, at which point Palmer said that "he was there to turn himself in that he had killed his wife." He also asked to be placed in handcuffs, read his *Miranda* warnings, and provided a lawyer. Atondo complied with the first request, which "seemed to calm [Palmer] down." He elected against the *Miranda* warnings, explaining, "I honestly did not—at the time I didn't believe that [Palmer killing his wife] actually may have occurred. And I didn't know if it was a crime that had occurred." Instead, he believed that Palmer was possibly homeless or suffering from mental illness, and he wanted to continue talking to test the credibility of Palmer's statements.

Aside from Palmer being somewhat emotional, Atondo described their interaction as "just a normal conversation" in which Palmer "spoke quite a bit" and kept repeatedly

12

"just giving [him] information." For example, when Atondo asked questions about Debra—her name, how they met, whether they had children—Palmer answered but also provided information about their rocky marriage. A short while later, after Atondo asked how Palmer got to the jail, Palmer volunteered the details of his trip "to tell goodbye to an aunt."

As the conversation continued, Atondo contacted dispatch to confirm that Palmer's address actually existed and to send officers to that location. When officers confirmed the existence of a house at Palmer's address, Atondo "started believing that something may have occurred there with his wife." As they waited for officers to enter Palmer's house, Atondo asked Palmer about any safety hazards there. Again, Palmer answered the question before providing additional information, saying "she's at the bottom of the stairs" and warning that the weapon "was still there in the house, in the basement." Atondo did not press Palmer for more details about the weapon or his wife's death.

In terms of the timeline, Atondo testified that Palmer said he killed his wife and confirmed his wife's name and their address before asking for a lawyer and his *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He clarified that he only asked about weapons in the home out of a concern for officer safety, not to elicit details about Debra's death. Atondo acknowledged that he asked Palmer fairly broad questions about Debra but clarified that he asked the questions "to figure out if [Palmer] was telling . . . the truth," not to uncover details about the crime.

Wilson-Diehl testified about her interaction with Palmer while she collected evidence from him. Wilson-Diehl explained that the officers had instructed her not to ask Palmer anything about the crime. The only question she asked was about back pain, and only after he complained of "a lot of pain in the middle of his back." That said, Palmer volunteered some information while Wilson-Diehl examined what appeared to be bug bites and scratches on his leg. According to Wilson-Diehl, "He told me that he had said

13

something to her many times that there is [*sic*] bugs in that basement. He told me that that's where he resides and he said that it's embarrassing. And she would say, go downstairs, Guy, nobody wants you here, Guy." Later, when she observed some swelling on his hands, he said that "it is from gripping the steering wheel so long. I did a dumb fuck thing today. If she hadn't taken those guns out of the house you can bet I wouldn't be here, but she did." The whole interaction lasted about 40 minutes.

At the close of testimony, the State essentially argued that Palmer was not in custody for most of his conversations, was never actually interrogated, and in fact volunteered almost all of the information at issue. The State acknowledged that Palmer was in custody during his second interaction with Torres and while speaking to Wilson-Diehl but emphasized that those statements arose out of small talk, not interrogation. In sum, the State asked the district court that

> "either you find that at the time the defendant made the statement he wasn't in custody, therefore, *Miranda* wasn't required and it wasn't an interrogation or like with . . . Wilson-Diehl that he was in custody, but that she didn't ask him questions, so his statements were completely voluntary because there was no interrogation being posed at the time."

Palmer, on the other hand, insisted that the questions the various officers asked him constituted the functional equivalent of custodial interrogation. In support of this position, he pointed to the location of the questioning, the breadth of some of the questions, the length of the interactions, his lack of freedom to leave, and the fact that Torres continued to talk to Palmer even after he brought up his wife.

When ruling, the district court divided out the different statements into five separate categories, ruling on each separately:

14

- *Palmer's initial statements to Torres and Woodson in the unsecured area of the jail*:  admissible because Palmer was not in custody. Additionally, the initial statements to Woodson did not constitute express questioning because Woodson simply wanted to understand Palmer's needs.
- *Palmer's statements to Woodson in the secured area of the jail*:  admissible under the public safety exception. Although Palmer "or someone in his position might feel they are not free to leave" in that situation, the district court reasoned "it would be reasonable under the circumstances to follow up further to determine whether anyone's life was in danger."
- *Palmer's statements to Atondo*:  admissible under the public safety exception because of the "potential danger to Ms. Palmer or others within the totality of the circumstances" and the need "to determine if Ms. Palmer or someone else was in need of immediate assistance."
- *Palmer's second set of statements to Torres*:  admissible as they were not the result of questioning or its functional equivalent. Instead, the district court determined that Torres was trying to keep Palmer calm, not to elicit incriminating responses.
- *Palmer's statements to Wilson-Diehl*:  admissible because they were not the result of express questioning or its functional equivalent.

The district court memorialized these findings in a journal entry with a written summary of its reasoning and supporting caselaw.

*Analysis*

When reviewing a district court's decision on a motion to suppress, this court applies a bifurcated standard of review. This court reviews any factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is subject to unlimited review. Importantly, this court cannot

15

reweigh the evidence or assess the credibility of witnesses when reviewing factual findings. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

On appeal, Palmer objects not to the district court's factual findings but rather the application of caselaw, claiming that the district court misapplied the public safety exception and that all of the questioning rose to the level of custodial interrogation. Additionally, Palmer does not challenge his initial statements to Torres or Woodson, but rather all the statements after Woodson moved him to the more secured portion of the jail.

The Fifth Amendment to the United States Constitution guarantees suspects in criminal investigations the right against self-incrimination, which includes both the right to an attorney during custodial interrogation and the right to remain silent. *State v. Cosby*, 285 Kan. 230, 241, 169 P.3d 1128 (2007). To safeguard against abuse of these rights, the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, held that law enforcement officers must inform a suspect about such rights before any statements arising out of custodial interrogation can be admitted in a criminal case against that suspect. *Cosby*, 285 Kan. at 241.

As this court explained a few years ago, "[t]here are two prerequisites to the applicability of *Miranda*: custody and interrogation." *State v. Johnson*, 46 Kan. App. 2d 387, 393, 264 P.3d 1018 (2011), *rev. denied* 293 Kan. 1111 (2012). When considering whether custodial interrogation occurred, a court must analyze the circumstances surrounding the questioning and determine "whether the totality of those circumstances would have led a reasonable person to believe he or she was not at liberty to terminate the interrogation." *State v. Schultz*, 289 Kan. 334, Syl. ¶ 3, 212 P.3d 150 (2009).

However, not all questioning constitutes an interrogation. In fact, an officer is not required to read an individual his or her *Miranda* warnings during general investigatory

16

questioning. *State v. Roadenbaugh*, 234 Kan. 474, 476, 673 P.2d 1166 (1983). Instead, the suspect must be "subjected to either express questioning or its functional equivalent." *State v. Hebert*, 277 Kan. 61, 68, 82 P.3d 470 (2004). This functional equivalent refers to "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' [Citation omitted.]" 277 Kan. at 69. Whether words or actions are likely to elicit an incriminating response "'focuses primarily upon the perceptions of the suspect, rather than the intent of the police.' [Citation omitted.]" 277 Kan. at 69.

Because the district court provided different rationales for the statements to Woodson and Atondo in the more secure lobby area and the statements to Torres and Wilson-Diehl after Palmer was undisputedly in custody, we will address each in turn.

*Statements in the secure lobby area*

In its ruling, the district court determined that once Woodson brought Palmer into the more secure area, Palmer likely felt unable to leave. However, the district court also determined that any of Woodson and Atondo's questions were justified under the public safety exception to *Miranda*.

The public safety exception arises in cases where "the need to ascertain the location of a potential danger to the public outweigh[s] the need for the 'prophylactic rule' of *Miranda*." *Cosby*, 285 Kan. at 241. As such, officers may directly question a suspect prior to reading any *Miranda* warnings in "situations where there is an immediate need for an officer to protect himself or herself or the public." *Cosby*, 285 Kan. at 241. However, it must be "objectively reasonable for the officer to believe the questioning is necessary to protect . . . the public from immediate danger." *Johnson*, 46 Kan. App. 2d at 394. Additionally, "the availability of [the] exception does not depend on the motivation

17

of the individual officers involved" provided that the questions are "reasonably prompted by a concern for the public safety, including the safety of a possible victim." *State v. Drennan*, 278 Kan. 704, Syl. ¶ 12, 101 P.3d 1218 (2004), *overruled on other grounds by State v. Neighbors*, 299 Kan. 234, 328 P.3d 1081 (2014).

*Drennan* is helpful in considering whether the public safety exception applies in this case. There, Shelbree Wilson's neighbor heard the defendant, Wilson's boyfriend, banging around outside during the wee hours of the morning. When the neighbor confronted him, the men engaged in a verbal altercation. Wilson then demanded that the defendant enter the house, prompting the defendant to "grab[] [Wilson] by the shoulder and neck and push[] her back into the house." The neighbor heard a "'ruckus'" and a scream from Wilson; when silence replaced the noise, he called 911. 278 Kan. at 708.

After the officers dispatched to the scene spoke to the neighbor, they knocked on Wilson's door. The defendant eventually exited the house into the garage, but he initially ignored the officers' request to step out and speak to them. When he finally approached the officers, he appeared glazed-over and agitated. After he also ignored their initial questions about Wilson and resisted a pat-down, officers placed him in handcuffs. They asked about Wilson again, and this time, the defendant responded cryptically, saying, "'I was going to give you some information, but now you'll just have to wait and see.'" 278 Kan. at 708-09. On a check of the home, officers discovered Wilson unconscious with a cord wrapped around her neck. Wilson later died.

Before trial and later on appeal, the defendant argued that he was in custody at the time the officers asked him about Wilson, which transformed their questioning into an interrogation and required they read his *Miranda* rights. Our Kansas Supreme Court determined that the district court correctly applied the public safety exception when ruling the statements admissible. The court noted that "the officers' concern in this case was not for the general public's safety" but determined that because "the officers had a

18

reasonable belief that [Wilson] might be in danger and in need of their assistance," the exception applied. 278 Kan. at 723-24. The court also pointed to cases from other jurisdictions that had held similarly. 278 Kan. 723.

At the time Woodson brought Palmer into the more secure lobby area, Palmer had already said that he had killed his wife. Uncertain as to the truth of this statement, Woodson asked Palmer a few more questions, such as her location and how to enter his home. Woodson focused his questions only on Debra's welfare because he wanted to "go do a welfare check on her." When Atondo arrived, he also asked questions about Palmer's wife in an attempt to evaluate the credibility of Palmer's claims. Once Atondo gathered enough information to believe that something actually happened to Debra, Atondo limited his questions to any potential safety hazards at the home.

Based on the circumstances, it appears objectively reasonable that both Woodson and Atondo believed the questioning necessary to protect a potential victim—namely, Debra—from immediate danger. For Woodson, Palmer's statement about killing Debra prompted him to elicit just enough information to secure a welfare check. Woodson never pressed Palmer for any details about the potential crime or his motivations. Although Atondo questioned Palmer from a slightly different angle, he was also reasonably prompted by a concern for Debra's safety, one that began by confirming that Debra existed and could be found at Palmer's address. Like Woodson, Atondo limited his questions to general information about Debra and the location of Palmer's home. As soon as Atondo had enough information to suspect "that something may have occurred [at the house] with his wife," he stopped asking Palmer any questions about Debra. Based on the circumstances presented and the scope of the officers' questions, the district court did not err in applying the public safety exception.

As an aside, Palmer implies in his brief that the public safety exception should not apply because he requested a lawyer several times throughout his time at the jail.

19

However, Palmer focused only on the lack of *Miranda* warnings below and not on his requests for an attorney. Because he never raised the issue of the officers failing to honor his request for a lawyer before the district court, Palmer cannot now rely on that argument on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014).

*Statements after Palmer was definitely in custody*

The last category of statements concern Palmer's interactions with Torres and Wilson-Diehl. As Atondo testified that Palmer was not free to leave after being placed in handcuffs, there is no reasonable dispute that Palmer was not in custody at the time he spoke to Torres and Wilson-Diehl. Instead, the question is whether these interactions constituted either direct questioning or its functional equivalent.

Torres sat with Palmer after Woodson and Atondo finished talking to him. According to Torres, she asked him innocuous questions to keep him calm. Torres testified that she limited her questions to Palmer's job, pets, and other small talk topics. With each question, Palmer steered the conversation back to Debra.

Although Torres asked Palmer questions, it is clear that they did not constitute direct questioning as they concerned topics far outside the issue of Debra's death. Moreover, the record demonstrates that Torres' behavior also never rose to the functional equivalent of questioning. Even in a situation such as this one, it is difficult to believe that a suspect would perceive an innocuous, small talk question about his job as one formulated to elicit an incriminating response. In fact, Torres' testimony demonstrated that she worked hard to keep the topic away from Debra and that Palmer actually volunteered comments about Debra. Torres' interaction with Palmer did not run afoul of *Miranda*.

20

As for Wilson-Diehl, she testified that she only asked Palmer one question during their entire interaction, which concerned his back pain. Wilson-Diehl specifically recalled that the officers instructed her not to ask questions. Obviously, Wilson-Diehl never directly questioned Palmer. Moreover, there is absolutely no reason to believe that the one question at issue constituted the functional equivalent of interrogation. The question arose out of a complaint from Palmer, and nothing in it was likely to elicit an incriminating response. And Wilson-Diehl's examination also did not rise to the functional equivalent of interrogation. Instead, Wilson-Diehl testified that Palmer spontaneously volunteered most of the information as she examined certain areas of his body. It cannot be reasonably said that a suspect would understand Wilson-Diehl's silence during an examination as requiring any response, let alone an incriminating one.

In conclusion, the district court did not err in denying Palmer's motion to suppress. Palmer's statements to Woodson and Atondo in the secure lobby area fell under the public safety exception. While Palmer was definitely in custody at the time he spoke to Torres and, later, to Wilson-Diehl, his comments were spontaneous and voluntary, not a response to the functional equivalent of interrogation. As such, the district court's decision is affirmed.

*Did the district court improperly classify one of Palmer's prior convictions as a person felony?*

Lastly, Palmer argues that *State v. Murdock*, 299 Kan. 312, 323 P.3d 846 (2014), *modified by Supreme Court order* September 19, 2014, *overruled by State v. Keel*, 302 Kan. 560, Syl. ¶ 9, 357 P.3d 251 (2015), required that the district court classify one of his prior convictions as a nonperson felony. In *Murdock*, our Kansas Supreme Court reasoned that all out-of-state felony convictions that predated the enactment of the Kansas Sentencing Guidelines Act (KSGA) needed to be scored as nonperson felonies. 299 Kan. at 319. In so ruling, the court relied heavily on *State v. Williams*, 291 Kan. 554,

21

244 P.3d 667 (2010), *overruled by State v. Keel*, 302 Kan. 560, Syl. ¶ 9, 357 P.3d 251 (2015), which discussed how to score out-of-state convictions for criminal history purposes. In his brief, Palmer urges this court to extend this holding to pre-KSGA in-state convictions.

But in August 2015, our Kansas Supreme Court expressly overruled both *Murdock* and *Williams*. See *Keel*, 302 Kan. 560, Syl. ¶ 9. In overruling these cases, our Supreme Court reestablished that all prior convictions, including those predating the KSGA, "must be classified as either a person or nonperson offense by comparing the criminal statute under which the prior offense arose to the comparable post-KSGA criminal statute . . . in effect at the time the current crime of conviction was committed." 302 Kan. 560, Syl. ¶ 8.

Because *Murdock* is no longer controlling law in Kansas, Palmer's insistence that this court should extend its holding fails. Palmer raises no other objections to his criminal history score or the classification of his prior convictions. As such, his sentence is affirmed.

Affirmed.

\* \* \*

ATCHESON, J., concurring:  I join with the majority in determining both that the evidence did not require a jury instruction on voluntary manslaughter despite Defendant Guy Palmer's request and that *State v. Keel*, 302 Kan. 560, Syl. ¶ 8, 357 P.3d 251 (2015), controls the treatment of Palmer's preguidelines felony conviction in establishing his criminal history in this case.

As to the remaining point on appeal, I see no prejudicial error in the admission of Palmer's out-of-court statements as part of the State's case to the jury. There are three sets of statements:  (1) Those Palmer made in the unsecured part of the jail when he first walked in; (2) those he made in the secured section of the jail both before and after he

22

was handcuffed; and (3) those he made later to Officer Fabiola Torres and still later to Karen Wilson-Diehl, the nurse who examined him. As to the first set of statements, I agree there was no custodial interrogation of Palmer. So those statements were admissible at trial. Likewise, as to the third set of statements, neither Torres nor Wilson-Diehl sought to interrogate Palmer. Based on the factual record, Palmer made those incriminating statements spontaneously and voluntarily. They were, therefore, admissible, as well.

I am not nearly as sure as the majority that the second set of statements should have been admitted at trial. I think there is a fair argument that Palmer was effectively placed in custody as soon as the officers escorted him into the secured area of the jail, and he almost certainly was after being handcuffed. The record is clear the officers did not inform Palmer of his rights as outlined in *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). I am similarly uneasy with the idea that the statements fell within some accepted application of the public safety doctrine.

But I need not delve deeper into those concerns and choose not to in a bow to efficiency. Even assuming the statements should have been suppressed and their admission at trial was, as a result, impermissible, Palmer must show material prejudice to warrant any relief. The record demonstrates that the content of the second set of statements simply duplicated what Palmer otherwise said both before and after. Most tellingly, of course, Palmer admitted killing his wife shortly after he arrived at the jail, and that confession was properly presented to the jury during the trial. So were Palmer's repeated statements about the tumultuous nature of his marital relationship. The second set of statements was cumulative of his other admissions. Allowing the jury to hear those statements would have been, at most, harmless error. I, therefore, see no basis for reversing Palmer's conviction.

23